# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | |
|---|---|
| MONICA DEL BOSQUE, JENNA RODRIGUEZ, FABIOLA SOLIS-GARAY, NICOLE WARE, and PHILIP WATTERSON, individually and on behalf of all others similarly situated, <br><br><br> Plaintiffs, <br><br> v. <br><br> COCA-COLA SOUTHWEST BEVERAGES LLC, <br><br> Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) )  **CIVIL ACTION NO.**: 3:25-cv-01270-X |

## AMENDED COMPLAINT[1]

Plaintiffs Monica Del Bosque, Jenna Rodriguez, Fabiola Solis-Garay, Nicole Ware, and Philip Watterson ("Plaintiffs"), by and through their attorneys, on behalf of the Coca-Cola Southwest Beverages 401(k) Plan (the "Plan"),[2] themselves and all others similarly situated, state and allege as follows:

## I.    INTRODUCTION

1.    This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the

---

[1] Plaintiffs file this Amended Complaint pursuant to FED. R. CIV. P. 15(a)(1)(B).

[2] The Plan is a legal entity that can sue and be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is not a party. Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants.

Plan's fiduciary, Coca-Cola Southwest Beverages LLC ("Coca-Cola SW" or the "Company"), for breaches of its fiduciary duties.

2.       The Plan is a defined contribution retirement plan or a 401(k) plan, established pursuant to 29 U.S.C. § 1002(2)(A) and § 1002(34) of ERISA, that enables eligible participants to make tax-deferred contributions from their salaries to the Plan. *See* Summary Plan Description for the Coca-Cola Southwest Beverages 401(k) Plan ("SPD"), at 3 ("The Plan is known as a defined contribution 401(k) profit sharing plan. It has been established to help you provide for your future financial securities through a combination of personal savings, current tax savings and contributions by your Employer."); *see also* Independent Auditor's Report ("Auditor's Report"), attached to 2023 Form 5500 for the Plan, at 7 ("The Plan is a defined contribution plan that was established on April 1, 2017 by Coca-Cola Southwest Beverages, LLC.").

3.       Like other companies that sponsor 401(k) plans for their employees, Coca-Cola SW enjoys both direct and indirect benefits by providing matching contributions to the Plan participants. Employers are generally permitted to take tax deductions for their contributions to 401(k) plans at the time when the contributions are made. *See generally,* https://www.irs.gov/retirement-plans/plan-sponsor/401k-plan-overview. However, Defendant has not followed ERISA's standard of care. This lawsuit is filed after careful review of publicly available documents to return benefits taken from Plan participants by Defendant.

4.       To safeguard plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries. Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B). These twin fiduciary duties are "the highest known to the law." *Ma*

2

*Kujanek v. Houston Poly Bag I Ltd.,* 658 F.3d 483 at 489 (5th Circuit 2011), *Martin on Behalf of Cal–Tex Protective Coatings v. Frail*, 2011 WL 13175089 at *14 (W.D. Tex. 2011), *Main v. American Airlines Inc.,* 248 F.Supp.3d 786 at 792 (N.D. Tex. 2017).

5.      The Department of Labor ("DOL") has explicitly stated that employers are held to a "high standard of care and diligence" and must, among other duties, both "establish a prudent process for selecting investment options and service providers." *See* "*A Look at 401(k) Plan Fees*," *supra*, at n.3; *see also Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1823 (2015) ("*Tibble I*") (reaffirming the ongoing fiduciary duty to monitor a plan's investment options).

6.      Under 29 U.S.C. § 1104(a)(1), a plan fiduciary must give substantial consideration to the cost of investment options. "Wasting beneficiaries' money is imprudent. In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs." Uniform Prudent Investor Act (the "UPIA"), § 7.

7.      "The Restatement … instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but also in monitoring and reviewing investments.'" *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197-98 (9th Cir. 2016) ("*Tibble II*") (en banc) (quoting Restatement (Third) of Trusts, § 90, cmt. b).

8.      Additional fees of only 0.18% or 0.4% can have a large effect on a participant's investment results over time because "[b]eneficiaries subject to higher fees…lose not only money spent on higher fees, but also lost investment opportunity; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time." *Tibble II*, 843 F.3d at 1198 ("It is beyond dispute that the higher the fees charged to a beneficiary, the more the beneficiary's investment shrinks.").

9.    The Supreme Court reiterated that interpreting "ERISA's duty of prudence in light of the common law of trusts" a fiduciary "has a continuing duty of some kind to monitor investments and remove imprudent ones" and a plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones. *Hughes v. Northwestern Univ.*, 142 S.Ct. 737, 741 (2022).

10.    Plaintiffs allege that during the putative Class Period, Defendant, as a "fiduciary" of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties owed to the Plan, to Plaintiffs, and to the other participants of the Plan by, *inter alia*, failing to objectively and adequately review the Plan's investment portfolio with due care to ensure that each investment option was prudent, in terms of cost and performance.

11.    At all times during the Class Period, the Plan had significant assets under management. At the Plan's fiscal year end in 2018, the Plan had $411,345,008 in assets under management that were/are entrusted to the care of the Plan's fiduciaries. *See* 2018 Form 5500 for the Plan, Schedule H, at 2.

12.    By 2023, the Plan had $543,218,631 in assets under management. *See* 2023 Form 5500 for the Plan, Schedule H, at 2.

13.    The Plan is also large in terms of the number of its participants. At the Plan's fiscal year end in 2018, the Plan had 9,475 participants with account balances. *See* 2018 Form 5500 for the Plan, at 2. By 2023, the Plan had 11,150 participants with account balances. *See* 2023 Form 5500 for the Plan, at 2. In 2021, only 0.1 percent (844 of 641,747) of plans in the country had more than 10,000 plan participants.[3]

---

[3] *See* The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at Plans, 2021 at Ex. 1.2, p. 7., available at https://www.idc.org/system/files/2024-08/24-ppr-dcplan-profile-401k.pdf.

14.     Plaintiffs also allege that Defendant breached the duties they owed to the Plan, to Plaintiffs, and to the other participants of the Plan by failing to "defray[] reasonable expenses of administering the [Plan]." 29 U.S.C. § 1104(a)(A)(ii). Defendant's failure stems from the use of Plan participant forfeited funds to reduce employer contributions to the Plan instead of using the funds to reduce or eliminate the amounts charged to Plan participants for Plan administrative costs. This action by the Defendant was a clear breach of the duties of prudence and loyalty to Plan participants and cost Plan participants millions of dollars.

15.     During the putative Class Period, Defendant, as a "fiduciary" of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties owed to the Plan, to Plaintiffs, and to the other participants of the Plan by, *inter alia*: (1) failing to objectively and adequately review the Plan's investment portfolio with due care to ensure that each investment option was prudent, in terms of cost and performance; and (2) failing to defray reasonable expenses of administering the Plan.

16.     Defendant's mismanagement of the Plan, to the detriment of participants and beneficiaries, constitutes a breach of the fiduciary duties of prudence and loyalty, in violation of 29 U.S.C. § 1104. Its actions were contrary to actions of a reasonable fiduciary and cost the Plan and its participants millions of dollars.

17.     Based on this conduct, Plaintiffs assert claims against Defendant for breach of the fiduciary duty of prudence (Count I), and breach of the fiduciary duty of loyalty (Count II).

## II.     JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29

U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq*.

20.     This Court has personal jurisdiction over Defendant because it is headquartered and transacts business in this District, resides in this District, and/or has significant contacts with this District, and because ERISA provides for nationwide service of process.

20.     Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the violations of ERISA occurred in this District and Defendant resides and may be found in this District. Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Defendant does business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## III.    PARTIES

### Plaintiffs

21.     Plaintiff, Monica Del Bosque ("Del Bosque"), resides in Carollton, TX. During her employment, Plaintiff Del Bosque participated in the Plan. Ms. Del Bosque invested in the JPMorgan SmartRetirement® 2040 A fund in the Plan. Plaintiff Del Bosque also suffered injury due to the fact that Defendant failed to use forfeited Plan funds to pay the Plan's administrative and recordkeeping ("RKA") services, which, if used to pay for RKA costs, would have reduced or eliminated the amounts charged to Plaintiff Del Bosque's individual account to pay for the RKA costs.

22.     Plaintiff, Jenna Rodriguez ("Rodriguez"), resides in Houston, TX. During her employment, Plaintiff Rodriguez participated in the Plan. Ms. Rodriguez invested in the JPMorgan SmartRetirement® 2055 A fund in the Plan. Plaintiff Rodriguez also suffered injury due to the fact that Defendant failed to use forfeited Plan funds to pay the Plan's RKA services, which, if used to

pay for RKA costs, would have reduced or eliminated the amounts charged to Plaintiff Rodriguez's individual account to pay for the RKA costs.

23.     Plaintiff, Fabiola Solis-Garay ("Solis-Garay"), resides in Fort Liberty, NC. During her employment, Plaintiff Solis-Garay participated in the Plan. Ms. Solis-Garay invested in the JPMorgan SmartRetirement® 2060 fund in the Plan. Plaintiff Solis-Garay also suffered injury due to the fact that Defendant failed to use forfeited Plan funds to pay the Plan's RKA services, which, if used to pay for RKA costs, would have reduced or eliminated the amounts charged to Plaintiff Solis-Garay's individual account to pay for the RKA costs.

24.     Plaintiff, Nicole Ware ("Ware"), resides in Jewett, TX. During her employment, Plaintiff Ware participated in the Plan. Plaintiff Ware suffered injury due to the fact that Defendant failed to use forfeited Plan funds to pay the Plan's RKA services, which, if used to pay for RKA costs, would have reduced or eliminated the amounts charged to Plaintiff Ware's individual account to pay for the RKA costs.

25.     Plaintiff, Philip Watterson ("Watterson"), resides in Spring, TX. During his employment, Plaintiff Watterson participated in the Plan. Mr. Watterson invested in the JPMorgan SmartRetirement® 2040 A fund in the Plan. Plaintiff Watterson also suffered injury due to the fact that Defendant failed to use forfeited Plan funds to pay the Plan's RKA services, which, if used to pay for RKA costs, would have reduced or eliminated the amounts charged to Plaintiff Watterson's individual account to pay for the RKA costs.

26.     Plaintiffs have standing to bring this action on behalf of the Plan because they participated in the Plan and were injured by Defendant's unlawful conduct. Plaintiffs are entitled to receive benefits in the amount of the difference between the value of their accounts currently,

or as of the time their accounts were distributed, and what their accounts are or would have been worth, but for Defendant's breaches of fiduciary duties as described herein.

27.    Plaintiffs did not have knowledge of all material facts necessary to understand that Defendant breached its fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.

**Defendant**

28.    Coca-Cola SW is the sponsor of the Plan and a named fiduciary of the Plan with a principal place of business at 5420 Lyndon B. Johnson Fwy, #800, Dallas, Texas. *See* The December 31, 2021 Form 5500 of the Plan filed with the United States Department of Labor ("2021 Form 5500") at 1. Coca-Cola SW, a company of Arca Continental, is one of the largest Coca-Cola bottlers in the United States. The Company makes, markets and distributes bottled beverages in Texas, and parts of Oklahoma, New Mexico and Arkansas. Coca-Cola SW currently employs "more than 8,000 associates who operate 7 production plants and 37 sales and distribution facilities, serving more than 31 million consumers."[4]

29.    The Company is a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) for several reasons. First, it is a named fiduciary under the Plan. *See* Adoption Agreement for the Transamerica Retirement Solutions, LLC Pre-Approved 401(k) Profit Sharing Plan ("Plan Doc."), at 2 ("Named Fiduciary Name: Coca-Cola Southwest

---

[4] https://www.cocacolaswb.com/home/#:~:text=CCSWB%20produces%2C%20markets%20and%20distributes,more%20than%2031%20million%20consumers last accessed on October 22 2024.

Beverages LLC"); Second, it exercised discretionary authority and control over Plan management and/or authority or control over management or disposition of Plan assets.[5]

## IV. CLASS ACTION ALLEGATIONS[6]

30. Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following proposed class ("Class"):

> All persons, except Defendant and Defendant's immediate family members, who were participants in or beneficiaries of the Coca-Cola Southwest Beverages 401(k) Plan, at any time between October 28, 2018 to the date of judgment (the "Class Period").[7]

31. The members of the Class are so numerous that joinder of all members is impractical. The 2023 Form 5500 lists 11,150 Plan "participants with account balances as of the end of the plan year." 2023 Form 5500, at 2.

32. Plaintiffs' claims are typical of the claims of the members of the Class. Like other Class members, Plaintiffs participated in the Plan and have suffered injuries as a result of Defendant's mismanagement of the Plan. Defendant treated Plaintiffs consistently with other Class members, and managed the Plan as a single entity. Plaintiffs' claims and the claims of all Class

---

[5] To the extent the Company or its Board designated its fiduciary responsibilities to other individuals or entities, or appointed other individuals or entities to take on fiduciary responsibilities under the Plan, the breaches of fiduciary duties alleged herein apply equally to those individuals or entities.

[6] Although this is a proposed class action, the allegations in this complaint are alternatively pled in derivative fashion on behalf of the Plan because class certification is not necessarily required for Plaintiffs to prosecute claims on behalf of the Plan and all participants. *See, e.g.*, *In re: Wilmington Trust Corp.*, 2013 WL 4757843, at *3 (D. Del. Sept. 4, 2013) (granting plaintiffs' motion to proceed derivatively on behalf of all plan participants without class certification, because of the nature of such claims). ERISA Section 502(a), 29 U.S.C. § 1132(a), authorizes pension plan participants to bring suit on behalf of a plan to recover losses to a plan.

[7] Plaintiffs reserve their right to seek modification of the close of the Class Period in the event that further investigation/discovery reveals a more appropriate end period.

members arise out of the same conduct, policies, and practices of Defendant as alleged herein, and all members of the Class have been similarly affected by Defendant's wrongful conduct.

33.     There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

A.     Whether Defendant is a fiduciary of the Plan;

B.     Whether Defendant breached its fiduciary duties of loyalty and prudence by engaging in the conduct described herein;

C.     The proper form of equitable and injunctive relief; and

D.     The proper measure of monetary relief.

34.     Plaintiffs will fairly and adequately represent the Class, and have retained counsel experienced and competent in the prosecution of ERISA class action litigation. Plaintiffs have no interests antagonistic to those of other members of the Class. Plaintiffs are committed to the vigorous prosecution of this action, and anticipate no difficulty in the management of this litigation as a class action.

35.     This action may be properly certified under Rule 23(b)(1). Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendant. Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

36.     In the alternative, certification under Rule 23(b)(2) is warranted because the Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## V.    THE PLAN

37.     The purpose of the Plan is to provide Coca-Cola SW employees "an easy way to save for [their] retirement using pre-tax contributions" that are directly deducted from employees' paychecks. SPD, at 3; *see also* Transamerica Retirement Solutions, LLC Pre-Approved 401(k) Profit Sharing Plan at 1 ("The purpose of the Plan is to provide retirement income benefits to Employees of the Participating Employer and to provide such Employees with an opportunity to accumulate retirement savings on a tax-deferred basis.").

38.     The Plan is a "defined contribution"[8] or "individual account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plan provides for individual accounts for each participant and for benefits based solely upon the amount contributed to those accounts, and any income, expense, gains and losses, and any forfeitures of accounts of the participants which may be allocated to such participant's account. Consequently, retirement benefits provided by the Plan are based solely on the amounts allocated to each individual's account.

39.     The Plan was established effective as of April 1, 2017. *See* SPD, at 3; *see also* 2023 Form 5500, at 1.

### *Eligibility*

40.     To participate in the Plan, a participant must have worked at the Company for at least thirty days. *See* SPD at 5; *see also* Auditor's Report attached to 2023 Form 5500, at 7 ("All

---

[8] SPD at 3 ("The Plan is known as a defined contribution 401(k) profit sharing plan.").

eligible employees may begin participating in the Plan upon attaining 30 days of service, with the entry date being the first day of the next payroll period following meeting the participation requirements.").

### *Contributions*

41.    Participants may elect to contribute up to 50% of their salary, "subject to the maximum amount permitted by law." SPD, at 7; *see also* Auditor's Report attached to 2023 Form 5500, at 7 ("The Plan allows participants to contribute up to 50% of eligible compensation on a pre-tax basis.").

42.    Further, "[p]articipants who have attained age 50 before the end of the plan year are eligible to make catch-up contributions." Auditor's Report attached to 2023 Form 5500, at 7; *see also* SPD, at 7 ("You may be allowed to make additional catch-up salary deferral contributions beginning in the calendar year in which you become age 50 or in any calendar year.").

43.    Finally, "[p]articipants may also contribute amounts representing distributions from other qualified defined benefit or defined contribution plans (rollovers)." Auditor's Report attached to 2023 Form 5500, at 7; *see also* SPD, at 10 ("[Participants] may elect that a direct rollover be made into this Plan from the other plan.").

44.    Coca-Cola SW "make[s] safe harbor matching contribution each payroll period equal to 100% of [participant's] first 3% of [their] pre-tax salary deferral contributions, plus 50% of the next 6% of [their] salary deferral contributions up to a maximum of 9% of [their] salary." SPD, at 9; *see also* Auditor's Report attached to 2023 Form 5500, at 7 ("Each pay period, the Company contributes a safe harbor matching contribution equal to 100% of the first 3% of eligible compensation that the employee contributes to the Plan, plus 50% of the participant's salary

deferrals that exceed 3% of eligible compensation up to a maximum of 9% of eligible compensation.").

45.    The Company, may also "choose to make an annual nonelective contribution." SPD, at 9; *see also* Auditor's Report attached to 2023 Form 5500, at 8 ("The Plan also provides for discretionary employer matching contributions and discretionary employer non- elective contributions.").

46.    Like other companies that sponsor 401(k) plans for their employees, Coca-Cola SW enjoys both direct and indirect benefits by providing matching contributions to Plan participants. Employers are generally permitted to take tax deductions for their contributions to 401(k) plans at the time when the contributions are made. *See generally,* https://www.irs.gov/retirement-plans/plan-sponsor/401k-plan-overview.

47.    Coca-Cola SW also benefits in other ways from the Plan's matching program. It is well-known that "[o]ffering retirement plans can help in employers' efforts to attract new employees and reduce turnover." *See* https://www.paychex.com/articles/employee-benefits/employer-matching-401k-benefits.

48.    Given the size of the Plan, Coca-Cola SW likely enjoyed significant tax and cost savings from offering a match.

### *Vesting*

49.    Participants are 100% fully vested in their voluntary contributions. *See* SPD, at 14; *see also* Plan Doc., at 48 ("Participants are always 100% fully vested in their Employee Contributions (including Elective Deferrals, Catch-Up Contributions, Roth Elective Deferrals, Voluntary After-Tax Contributions and Required After-Tax Contributions)").

50.     "Safe harbor matching contributions, nonelective contributions and minimum contributions, if any, become [100%] 'vested'" after two years of completed service. SPD, at 15; *see also* Plan Doc., at 48.

51.     In addition, employees become 100% vested in safe harbor matching contributions, nonelective contributions and minimum contributions, after they reach the age of 65, become permanently disabled, or die. *See* SPD, at 16.

### *Forfeited Accounts*

52.     "The portion of [participants'] account that is not yet vested will be considered a 'forfeiture.'" SPD, at 17.

53.     Forfeitures of nonelective contributions can be used to: (1) restore participant accounts; (2) offset Plan expenses; or (3) reduce any nonelective contributions. *Id*.

54.     Forfeitures of matching contributions can be used to: (1) restore participants accounts; or (2) reduce any matching contributions. *Id*.

55.     "Effective August 1, 2023, the Plan was amended to allow the use of forfeitures from nonelective contributions to reduce future matching contributions." Auditor's Report attached to 2022 Form 5500, at 17.

### *The Plan's Investments*

56.     Several funds were available to Plan participants for investment each year during the Class Period, including several JPMorgan SmartRetirement® target date funds ("JPMorgan TDFs").[9] For 2018, the Plan offered 22 investment options, including 14 mutual funds worth $240,943,644. *See* Auditor's Report attached to 2018 Form 5500, at 14.

---

[9] After November 17, 2021, the assets in the JPMorgan TDFs were transferred to BlackRock LifePath Index series target date funds. *See* Auditor's Report attached to 2021 Form 5500, at 17.

57. The Plan's assets under management for all funds at the end of 2018 totaled $411,345,008. *See* 2018 Form 5500, Schedule H, at 2.

58. By the end of 2023, the Plan's assets under management totaled $543,218,631. *See* 2023 Form 5500, Schedule H, at 2.

## VI. THE TOTALITY OF THE CIRCUMSTANCES DEMONSTRATES THAT THE PLAN'S FIDUCIARIES FAILED TO ADMINISTER THE PLAN IN A PRUDENT MANNER

### A. Overview - ERISA Fiduciaries Are Held to the Highest Standards Regarding Process and Methodology of Evaluating Investments

59. As described in the "Parties" section above, Defendant was a fiduciary of the Plan.

60. ERISA "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted). In addition to a duty to select prudent investments, under ERISA, a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exist "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble I*, 135 S. Ct. at 1828; *see also Hughes*, 142 S.Ct. at 741.

61. Plaintiffs did not have and do not have actual knowledge of the specifics of Defendant's decision-making process with respect to the Plan, including Defendant's processes (and execution of such) for selecting, monitoring, and removing the Plan's investments because this information is solely within the possession of Defendant prior to discovery.

62. In fact, in an attempt to discover the details of the Plan's mismanagement, Plaintiffs wrote to the Plan administrator to request, among other things, "all written instruments" governing or pertaining to the Plan, including "investment policy statements and investment management contracts, or other instruments under which the Plan was established or operated, and all

15

amendments, exhibits, or appendices thereto," as well as any committee's meeting minutes. This request was made on September 27, 2022.

63.     By letter dated October 22, 2022, Coca-Cola SW responded to Plaintiffs' request. No investment policy statement, to the extent it exists, or meeting minutes, to the extent they exist, were produced in response to Plaintiffs' request.

64.     Reviewing meeting minutes, when they exist, is the bare minimum needed to peek into a fiduciary's monitoring process. But in most cases, even that is not sufficient. For, "[w]hile the absence of a deliberative process may be enough to demonstrate imprudence, the presence of a deliberative process does not … suffice in every case to demonstrate prudence. Deliberative processes can vary in quality or can be followed in bad faith. In assessing whether a fiduciary fulfilled her duty of prudence, we ask 'whether a fiduciary employed the *appropriate* methods to investigate and determine the merits of a particular investment,' not merely whether there were any methods whatsoever." *Sacerdote v. New York Univ.*, 9 F.4th 95, 111 (2d Cir. 2021) (emphasis in original).

65.     For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these processes and methods based upon several factors as described below.

66.     As stated by the DOL: ERISA "requires plan fiduciaries, when selecting and monitoring service providers and plan investments, to act prudently and solely in the interest of the plan's participants and beneficiaries. Responsible plan fiduciaries also must ensure that arrangements with their service providers are 'reasonable' and that only 'reasonable' compensation is paid for services. …" DOL 408(b)(2) Regulation Fact Sheet.

67.     The duty "…to act solely in the best interest of participants has been a key tenet of ERISA since its passage." "Best Practices for Plan Fiduciaries," at 36, published by Vanguard, 2019.[10]

68.     Acting in the sole interest of plan participants is all encompassing. A fiduciary must monitor all investment options in a 401(k) plan as a prudent investment professional. *See* the U.S. Department of Labor, Employee Benefits Security Administration (EBSA)'s "Meeting Your Fiduciary Responsibilities," at 2 ("The duty to act prudently is one of a fiduciary's central responsibilities under ERISA. It requires expertise in a variety of areas, such as investments."), available at https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/meeting-your-fiduciary-responsibilities.pdf.

69.     A prudent investment professional, and hence a fiduciary, must regularly evaluate a fund's performance history, the portfolio manager's experience and tenure, changes to the fund's investment strategy, changes to the underlying assets in the investment, total assets under management within the fund, fees, and other relevant factors.

70.     With respect to investment returns, diligent investment professionals monitor the performance of their selected investments using appropriate industry-recognized "benchmarks" and prudently managed equivalents.

71.     The measurement of investments against prudently managed alternatives is critical given that these alternatives represent other investments available to a plan, which may increase the likelihood that participants reach/live their preferred lifestyle in retirement.

72.     The specific methodologies used to select prudent investments are primarily data driven. Such data is provided by investment research companies like Morningstar, which is the

---

[10] Available at https://institutional.vanguard.com/iam/pdf/FBPBK.pdf?cbdForceDomain.

most accepted source of investment performance information, as it has the most robust information on mutual funds, collective investment trusts, and other types of investments. Indeed, Morningstar is used and trusted by virtually all financial professionals and fiduciaries.

73.     Whether a plan fiduciary enlists the assistance of an investment manager, consultant, or advisor, the plan's fiduciaries are not relieved of fiduciary liability for selecting and monitoring the plan's investment options.

74.     It is black letter law that a fiduciary's duty to conduct an "independent investigation into the merits of a particular investment," is the "most basic of ERISA's investment fiduciary duties." *In re Unisys Savings Plan Litigation*, 74 F.3d 420, 435 (3d Circ. 1996). *Hughes*, 142 S.Ct. at 738 (noting ERISA fiduciaries are required to "conduct their own independent evaluation to determine which investments may by prudently included in the plan's menu of options.").

75.     Lastly, to the extent plan fiduciaries have adopted an investment policy statement, which does not appear to be the case here, those fiduciaries "must comply with the plan's written statements of investment policy, insofar as those written statements are consistent with the provisions of ERISA." *Lauderdale v. NFP Retirement, Inc.*, 2022 WL 17260510, at * 10 (S.D. Cal. Nov. 17, 2022). That is, the investment policy statement must be written with the sole interest of the plan participant in mind.

76.     Defendant's breaches of their fiduciary duties, relating to their overall decision-making, resulted in, *inter alia*, the selection (and maintenance) of the JPMorgan TDFs in the Plan throughout the Class Period that wasted the assets of the Plan and the assets of participants because of unnecessary costs and underperformance.

### B.     Defendant Breached Its Fiduciary Duties by Selecting and Retaining in the Plan's Lineup the Chronically Underperforming JPMorgan TDFs

#### 1.     The Plan's Inclusion of JPMorgan TDFs

77.     At all relevant times, Defendant maintained the authority to exercise control over the Plan's investments, including the Plan's JPMorgan TDFs. The JPMorgan TDFs were offered in several different forms including the A, C, R, or I share classes.

78.     Defendant included in the Plan's menu of investment offerings the materially underperforming JPMorgan TDFs.

79.     Target date funds are designed to provide a single diversified investment vehicle for plan participants. Target date funds are offered as a suite of funds, with each fund based on the participant's anticipated retirement date.

80.     The first target date funds in the industry were offered as early as 1994, and since then the market for target date funds has exploded with numerous investment managers offering a variety of different target date fund investments.

81.     Although no two target date series are identical, the general strategy, underlying investments, and risk profile is the same across all target date series: "[a] target-date fund is a fund of funds that provides asset-class diversity through a blend of stocks and bonds. Portfolios are adjusted for lower risk as they approach a designated target date" of retirement. https://www.morningstar.com/investing-definitions/target-date funds-. The subtle differences between series are what makes them more or less prudent than others, especially in terms of performance predictability.

82.     By the mid-2000s, many target date funds with established performance histories were available to defined contribution plans. By 2009, several target date funds had performance histories of five years or more.

83.     Multiple types of assets are included in a target date fund portfolio, including equity (stock) and fixed income (bond) securities. Target date funds offer diversity and balanced exposure to a broad array of underlying securities included in the fund.

84.     An investment in a single target date fund can be attractive to plan participants who do not want to actively manage their retirement savings and periodically convert to more conservative holdings as their retirement date draws near. Target date funds automatically rebalance their portfolios to become more conservative as the participant gets closer to retirement.

85.     This rebalancing occurs based on the fund's "glide path." A glide path determines how the fund's target asset allocations across the underlying securities are expected to change over time and how they become more conservative as the target retirement date approaches.

86.     The target date refers to the participant's expected retirement year. For example, "target date 2030" funds are designed for individuals who intend to retire in 2030. As the year 2030 approaches, the fund's investment manager adjusts the underlying asset mix to become more conservative.

87.     Target date funds have been divided into two broad categories by some industry professionals based on the fund's glide path: "To" and "Through" target date funds. A "To" target date fund is designed to allocate its underlying assets to the most conservative investments at the year of the expected retirement. In contrast, a "Through" target date fund continues its glidepath progression to reach its most conservative asset allocation past the expected retirement date. This method focuses on the life expectancy of the participant rather than the retirement date.

88.     The JPMorgan TDFs in the Plan were "Through" funds.

89.     Another broad classification of target date funds is "actively" or "passively" managed funds. With an actively managed fund, the portfolio manager attempts to select stocks or

bonds to generate investment returns that exceed the relevant benchmark index return. With a passively managed fund, the portfolio manager attempts to mimic the performance of a relevant benchmark index. No discretion or research is needed for passive funds, in contrast to actively managed funds. Because of this, passive or index funds charge a much lower investment management fee and have a lower total "expense ratio" relative to active funds.[11]

90.     A fiduciary's duty to ensure that a prudent target date fund is offered to plan participants is heightened when considering the circumstances in which these funds are used by participants. Given the structure of target date funds, participants often invest all their retirement assets in a single target date fund that matches their retirement date. Some plans, like the Plan, make target date funds the default selection if plan participants do not select a specific fund within the 401(k) plan's lineup of investments. The use of a plan's target date funds as the default investment option underscores the importance of a prudent and diligent process of monitoring target date funds by plan fiduciaries.

91.     A fiduciary must monitor all investment options in a 401(k) plan as a prudent investment professional. Here, the performance histories of the JPMorgan SmartRetirement Series were mediocre when compared to their appropriate peer groups.

### 2.     Morningstar Benchmarks are Meaningful for Evaluating the Underperformance of the JPMorgan SmartRetirement Series

92.     With respect to investment returns, as discussed above, diligent investment professionals monitor the performance of their selected target date funds using appropriate industry-recognized "benchmarks" and prudently managed equivalents.

---

[11] The fees of mutual funds and similar investment alternatives are usually expressed as a percentage of assets under management, or "expense ratio." For example, if the fund deducts 1% of fund assets each year in fees, the fund's expense ratio would be 1%, or 100 basis points ("bps"). One basis point is equal to 1/100th of one percent.

93.    Morningstar, the most well respected and accepted financial industry fund database has created the Morningstar Lifetime Moderate Index category as the index category for target date funds.

94.    A Morningstar Category is assigned by placing funds into peer groups based on their underlying holdings. The underlying securities in each portfolio are the primary factor in [Morningstar's] analysis . . . . Funds are placed in a category based on their portfolio statistics and compositions over the past three years. Analysis of performance and other indicative facts are also considered." *See* Morningstar's summary of the Northern Trust Focus 2045 Fund, filed in *Allegretti v. Walgreen Co. et al*., No. 19-cv-05392 at Dkt. 43 ECF pg. 28 (N.D. Ill. Dec. 6, 2019). The analysis in *Allegretti* similarly deals with the Morningstar Lifetime Moderate Index category. *Id.*

95.    Further, as Morningstar states, it created its categories "to help investors make meaningful comparisons between mutual funds. Morningstar found that the investment objective listed on a fund's prospectus often did not adequately explain how the fund was actually invested." Morningstar Category Classification, 31 March 2022 ("Morningstar Classifier")[12] at page 5. The Morningstar Classifier goes on to state that "[f]or example, many funds claimed to be seeking "growth," but some of those were investing in established blue-chip companies while others were investing in small-cap companies." *Id.*

96.    Additionally, the measurement of target date funds against prudently managed alternatives is critical given that these alternatives represent other target date funds available to the plan, which may be a more appropriate choice to meet participants' retirement needs.

---

[12] Available at the following web address:
https://advisor.morningstar.com/Enterprise/VTC/MorningstarCategoryClassificationforFunds_April2022.pdf. Last accessed on August 6, 2025.

97.    By 2010, multiple investment firms and banks offered target date funds with established and consistent performance histories, stable and experienced management, and discrete changes to the underlying assets and allocations.

98.    Established target date fund investment managers include, but are not limited to, American Funds, T.Rowe Price and Mutual of America. American Funds and T.Rowe have each offered target date funds for nearly 20 years with Mutual of America's offering being closer to 15 years and those target date funds have provided stable investment returns to 401(k) plan participants.

        a.    <u>American Funds.</u>  The American Funds target date funds pursue the same investment objectives as the JPMorgan SmartRetirement funds, invest primarily in equity (stock) and fixed income (bond) securities as do the JPMorgan SmartRetirement funds, invest in both U.S. and foreign securities as do the JPMorgan SmartRetirement funds, utilize a "through" glide path as do the JPMorgan SmartRetirement funds, are managed by well-known investment advisers, and are available to all large retirement plans including the Plan.[13]

        b.    <u>MFS Lifetime.</u>  The MFS Lifetime Funds target date funds pursue the same investment objectives as the JPMorgan SmartRetirement funds, invest primarily in equity (stock) and fixed income (bond) securities as do the JPMorgan SmartRetirement funds, invest in both

---

[13] *See* American Funds Target Date Retirement Series Prospectus dated Jan. 1, 2022, *available at* *https://www.capitalgroup.com/individual/pdf/shareholder/mfgeprx-850-tdrsp.pdf* (last visited February 6, 2025)

U.S. and foreign securities as do the JPMorgan SmartRetirement funds, utilize a "through" glide path as do the JPMorgan SmartRetirement funds, are managed by well-known investment advisers, and are available to all large retirement plans including the Plan.[14]

c.   <u>Mutual of America</u>.  The Mutual of America Clear Passage target date funds pursue the same investment objectives as the JPMorgan SmartRetirement funds, invest primarily in equity (stock) and fixed income (bond) securities as do the JPMorgan SmartRetirement funds, invest in both U.S. and foreign securities as do the JPMorgan SmartRetirement funds, utilize a "through" glide path as do the JPMorgan SmartRetirement funds, are managed by well-known investment advisers, and are available to all large retirement plans including the Plan.[15]

d.   <u>T. Rowe Price</u>.  The T.Rowe Price target date funds pursue the same investment objectives as the JPMorgan SmartRetirement funds, invest primarily in equity (stock) and fixed income (bond) securities as do the JPMorgan SmartRetirement funds, invest in both U.S. and foreign securities as do the JPMorgan SmartRetirement funds, utilize a "through" glide path as do the JPMorgan SmartRetirement

---

[14] *See* MFS Lifetime Funds Brochure, *available at* *https://www.mfs.com/content/dam/mfs-enterprise/mfscom/sales-tools/sales-brochures/mfsp_lfefund_bro_DOD.pdf* (last visited August 6, 2025).
[15] *See* MoA Funds, available at *https://www.moafunds.com/funds/target-date/clear-passage-2015* (last visited August 6, 2025)

funds, are managed by well-known investment advisers, and are available to all large retirement plans including the Plan.[16]

99.    The JPMorgan TDFs can thus be compared to the American Funds, MFS Lifetime, Mutual of America Clear Passage, and T.Rowe Price target date funds ("Comparator Funds") as benchmarks.

100.    Morningstar places the four Comparator Funds and the JPMorgan TDFs in the Lifetime Moderate Index category because the underlying holdings of each fund match the risk return profile of this category. As is demonstrated by the Morningstar graphs at Appendix "A," all five funds concentrate their holdings in the large blend risk/return category. It's for this reason that the four Comparator Funds are accurate comparators.

101.    Additionally, each of the Comparator Funds is actively managed while the JPMorgan TDFs is a blend of passive and active management. Thus, the Comparator Funds and the JPMorgan SmartRetirement Series have active management.

102.    All target date funds, however, in a true sense are actively managed because the glide path of the funds must be managed by an investment manager. Regardless, for purposes of comparing the JPMorgan TDFs and the Comparator Funds it matters little whether the funds are actively or passively managed because their underlying asset allocations are similar (*e.g.,* equity v. fixed income) and all the target date funds have the same investment objective.

103.    That is, depending on the proximity to its target date, defined as the year that corresponds roughly to the year in which the retiree expects to retire, the fund will seek to achieve the following objectives to varying degrees: growth, income and conservation of capital. The fund

---

[16] *See* T. Rowe Price Target Funds Brochure, *available at* *https://www.troweprice.com/content/dam/retirement-plan-services/pdfs/investments/target-date/Target_Funds_Brochure.pdf* (last visited August 6, 2025)

will increasingly emphasize income and conservation of capital by investing a greater portion of its assets in fixed income, equity-income and balanced funds as it continues past its target date. In this way, the fund seeks to balance total return and stability over time.

104.     A prudent fiduciary should have used some or all of these benchmarks, or substantially similar benchmarks (as discussed below), to evaluate the performance of the JPMorgan TDFs as early as the inception of the Class Period, or sooner, and on an ongoing basis thereafter.

### 3.     The JPMorgan TDFs Chronically Underperformed Based under Morningstar and Should Have Been Never Selected in the First Place

105.     From the start of the Class Period through at least 2021, the Plan maintained the JPMorgan TDFs in the A share class, which was JPMorgan SmartRetirement Passive blend series. In 2018, the Plan held over $204 million in the JPMorgan TDFs. *See* Auditor's Report attached to 2018 Form 5500 at 14. By the end of 2020, the Plan held over $234 million in the JPMorgan TDFs. *See* Auditor's Report attached to 2020 Form 5500 at 13. With such a large amount invested in the target date series, the Plan would have been able to choose virtually any available target date series for the Plan.

106.     The JPMorgan TDFs were the only target date investing options in the Plan up to November 17, 2021.[17] In other words, up to November 17, 2021, participants in the Plan who wanted to invest in a target date strategy had no choice other than the JPMorgan TDFs.

107.     Defendant was under an obligation under ERISA to carefully vet the JPMorgan TDFs before selecting them for inclusion in the Plan. Defendant was also under a continuing

---

[17] JPMorgan TDFs ended as an investment option on November 17, 2021. *See* Schedule C, Line 2(h) Formula Descriptions attached to 2021 Form 5500. The assets in the JPMorgan TDFs were transferred to BlackRock LifePath Index series target date funds.

obligation under ERISA to carefully monitor and scrutinize the performance of the JPMorgan TDFs on an ongoing basis thereafter.

108.    The performance of the JPMorgan TDFs lagged behind the performance of the applicable Comparator Funds for many years before the inception of the Class Period clearly showing that it was an imprudent choice for the Plan.

109.    The three and five year averages as early as 2014, prior to the Class Period, shows that the JPMorgan TDFs have been historically an imprudent selection. It is clear that out of more than 200 Morningstar peer funds in the LT Mod target date group, the JPMorgan series was mediocre at best from 2014. Here, four target date series from this Morningstar peer group, the Comparator Funds identified above, will be analyzed. As of the start of the Class Period, the three and five year average returns for the Comparator Funds were consistently superior to the JPMorgan TDFs used by the Plan. The chart below analyzes these funds against the JPMorgan TDFs as of December 31, 2014.

| Investment and Benchmark | 3 Year Return 1/1/2016 - 12/31/2018 | JPMorgan TDF % of Under-performance To Comparators | 5 Year Return 1/1/2014 - 12/31/2018 | JPMorgan TDF % of Under-performance To Comparators |
|---|---|---|---|---|
| **JPMorgan SmartRetirement® 2030 A** | **5.00** | | **4.14** | |
| American Funds 2030 Trgt Date Retire R6 | 6.92 | 38.40% | 5.63 | 36.03% |
| MFS Lifetime 2030 I | 6.29 | 25.80% | 4.47 | 8.10% |
| MoA Clear Passage 2030 Fund | 6.29 | 25.80% | 4.90 | 18.54% |
| T. Rowe Price Retirement 2030 | 6.43 | 2.23% | 5.03 | 21.65% |
| Benchmark: Morningstar Lifetime Mod 2030 TR USD | 6.26 | 25.20% | 4.44 | 7.35% |
| | | | | |
| **JPMorgan SmartRetirement® 2035 A** | **5.08** | | **4.17** | |
| American Funds 2035 Trgt Date Retire R6 | 7.43 | 46.26% | 5.95 | 42.72% |
| MFS Lifetime 2035 I | 6.52 | 28.35% | 4.65 | 11.58% |
| MoA Clear Passage 2035 Fund | 6.53 | 28.54% | 4.98 | 19.53% |
| T. Rowe Price Retirement 2035 | 6.61 | 30.12% | 5.18 | 24.19% |

| | | | | |
|---|---|---|---|---|
| Benchmark: Morningstar Lifetime Mod 2035 TR USD | 6.72 | 32.28% | 4.61 | 10.69% |
| | | | | |
| **JPMorgan SmartRetirement® 2040 A** | **5.34** | | **4.30** | |
| American Funds 2040 Trgt Date Retire R6 | 7.62 | 42.70% | 6.05 | 40.64% |
| MFS Lifetime 2040 I | 6.70 | 25.47% | 4.80 | 11.69% |
| MoA Clear Passage 2040 Fund | 6.46 | 20.97% | 4.75 | 10.41% |
| T. Rowe Price Retirement 2040 | 6.77 | 26.78% | 5.30 | 23.30% |
| Benchmark: Morningstar Lifetime Mod 2040 TR USD | 6.98 | 30.71% | 4.65 | 8.24% |
| | | | | |
| **JPMorgan SmartRetirement® 2045 A** | **5.29** | | **4.28** | |
| American Funds 2045 Trgt Date Retire R6 | 7.77 | 46.88% | 6.17 | 44.25% |
| MFS Lifetime 2045 I | 6.83 | 29.11% | 4.88 | 14.06% |
| MoA Clear Passage 2045 Fund | 6.40 | 20.98% | 4.63 | 8.36% |
| T. Rowe Price Retirement 2045 | 6.81 | 28.73% | 5.31 | 24.28% |
| Benchmark: Morningstar Lifetime Mod 2045 TR USD | 7.05 | 33.27% | 4.60 | 7.56% |
| | | | | |
| **JPMorgan SmartRetirement® 2050 A** | **5.27** | | **4.26** | |
| American Funds 2050 Trgt Date Retire R6 | 7.83 | 48.51% | 6.19 | 45.21% |
| MFS Lifetime 2050 I | 6.80 | 29.00% | 4.86 | 14.03% |
| MoA Clear Passage 2050 Fund | 6.33 | 20.04% | 4.93 | 15.54% |
| T. Rowe Price Retirement 2050 | 6.80 | 29.00% | 5.32 | 24.83% |
| Benchmark: Morningstar Lifetime Mod 2050 TR USD | 7.05 | 33.72% | 4.51 | 5.79% |
| | | | | |
| **JPMorgan SmartRetirement® 2055 A** | **5.29** | | **4.29** | |
| American Funds 2055 Trgt Date Retire R6 | 7.81 | 47.70% | 6.17 | 43.85% |
| MFS Lifetime 2055 I | 6.62 | 25.28% | 4.76 | 10.81% |
| MoA Clear Passage 2055 Fund | | | | |
| T. Rowe Price Retirement 2055 | 6.78 | 28.21% | 5.31 | 23.60% |
| Benchmark: Morningstar Lifetime Mod 2055 TR USD | 7.04 | 33.21% | 4.42 | 3.07% |
| | | | | |
| **JPMorgan SmartRetirement® 2060 A** | **N/A** | | **N/A** | |
| American Funds 2060 Trgt Date Retire R6 | N/A | | N/A | |
| MFS Lifetime 2060 I | N/A | | N/A | |
| MoA Clear Passage 2060 Fund | 6.75 | | N/A | |
| T. Rowe Price Retirement 2060 | 7.02 | | N/A | |

| | | | | |
|---|---|---|---|---|
| Benchmark: Morningstar Lifetime Mod 2060 TR USD | 7.02 | | 4.34 | |

110.    By 2018, the start of the Class Period, the JPMorgan TDFs underperformed the Comparator Funds on average by 30.21% on a three-year basis and 23.26% on a five-year basis. In fact, the JPMorgan TDFs underperformed every Comparator Fund for each target date series on a three-year and five-year basis.

111.    Further, by the start of the Class Period in 2018, the JPMorgan TDFs underperformed the Morningstar benchmark on average by 31.40% on a three-year basis and 7.12% on a five-year basis. The chart above demonstrates that the JPMorgan TDFs should never have been selected as an investment option for Plan participants at the inception of the Plan in 2017, or at the start of the Class Period in 2018.

112.    Clearly, analyzing data that would have been available to the Plan at the start of the Class Period, the JPMorgan TDFs were an imprudent selection. As of 2014, there were known superior performing alternatives which should have been selected. These alternatives are in the same style as the JPMorgan TDFs, namely in the Morningstar Life Time Moderate category. These four funds are just a few out of possibly a hundred or more funds in this category which would have been superior to the JPMorgan TDFs.

113.    This trend continued into 2016 as demonstrated in the chart below.

| Investment and Benchmark | 3 Year Return 1/1/2018 - 12/31/2020 | JPMorgan TDF % of Under-performance To Comparators | 5 Year Return 1/1/2016-12/31/2020 | JPMorgan TDF % of Under-performance To Comparators |
|---|---|---|---|---|
| JPMorgan SmartRetirement® 2030 A | 7.58 | | 9.36 | |
| American Funds 2030 Trgt Date Retire R6 | 9.84 | 29.70% | 11.06 | 18.16% |
| MFS Lifetime 2030 I | 8.76 | 15.57% | 10.37 | 10.81% |
| MoA Clear Passage 2030 Fund | 8.39 | 10.57% | 10.33 | 10.39% |
| T. Rowe Price Retirement 2030 | 9.98 | 31.66% | 11.34 | 21.17% |
| Benchmark: Morningstar Lifetime Mod 2030 TR USD | 9.09 | 19.83% | 10.58 | 13.05% |

| | | | | |
|---|---|---|---|---|
| **JPMorgan SmartRetirement® 2035 A** | **8.20** | | **10.07** | |
| American Funds 2035 Trgt Date Retire R6 | 11.19 | 36.46% | 12.44 | 23.51% |
| MFS Lifetime 2035 I | 9.49 | 15.71% | 11.28 | 12.04% |
| MoA Clear Passage 2035 Fund | 8.85 | 7.85% | 10.97 | 8.95% |
| T. Rowe Price Retirement 2035 | 10.48 | 27.73% | 11.90 | 18.16% |
| Benchmark: Morningstar Lifetime Mod 2035 TR USD | 9.14 | 11.40% | 11.14 | 10.63% |
| | | | | |
| **JPMorgan SmartRetirement® 2040 A** | **8.61** | | **10.66** | |
| American Funds 2040 Trgt Date Retire R6 | 11.76 | 36.61% | 12.99 | 21.93% |
| MFS Lifetime 2040 I | 9.66 | 12.20% | 11.61 | 8.99% |
| MoA Clear Passage 2040 Fund | 9.07 | 5.33% | 11.20 | 5.11% |
| T. Rowe Price Retirement 2040 | 10.93 | 26.92% | 12.38 | 16.20% |
| Benchmark: Morningstar Lifetime Mod 2040 TR USD | 9.10 | 5.75% | 11.48 | 7.75% |
| | | | | |
| **JPMorgan SmartRetirement® 2045 A** | **8.86** | | **10.85** | |
| American Funds 2045 Trgt Date Retire R6 | 11.96 | 34.92% | 13.22 | 21.86% |
| MFS Lifetime 2045 I | 9.77 | 10.18% | 11.86 | 9.36% |
| MoA Clear Passage 2045 Fund | 8.97 | 1.26% | 11.19 | 3.15% |
| T. Rowe Price Retirement 2045 | 11.20 | 26.41% | 12.63 | 16.46% |
| Benchmark: Morningstar Lifetime Mod 2045 TR USD | 9.03 | 1.94% | 11.61 | 7.01% |
| | | | | |
| **JPMorgan SmartRetirement® 2050 A** | **8.84** | | **10.83** | |
| American Funds 2050 Trgt Date Retire R6 | 12.12 | 37.08% | 13.36 | 23.38% |
| MFS Lifetime 2050 I | 9.74 | 10.10% | 11.83 | 9.20% |
| MoA Clear Passage 2050 Fund | 8.86 | 0.15% | 11.18 | 3.26% |
| T. Rowe Price Retirement 2050 | 11.19 | 26.52% | 12.62 | 16.55% |
| Benchmark: Morningstar Lifetime Mod 2050 TR USD | 8.96 | 1.31% | 11.62 | 7.28% |
| | | | | |
| **JPMorgan SmartRetirement® 2055 A** | **8.88** | | **10.85** | |
| American Funds 2055 Trgt Date Retire R6 | 12.11 | 36.32% | 13.35 | 23.09% |
| MFS Lifetime 2055 I | 9.76 | 9.90% | 11.72 | 8.04% |
| MoA Clear Passage 2055 Fund | 8.90 | 0.20% | | |
| T. Rowe Price Retirement 2055 | 11.15 | 25.50% | 12.59 | 16.09% |
| Benchmark: Morningstar Lifetime Mod 2055 TR USD | 8.88 | 0.00% | 11.61 | 7.01% |
| | | | | |
| **JPMorgan SmartRetirement® 2060 A** | **8.89** | | **N/A** | |
| American Funds 2060 Trgt Date Retire R6 | 12.11 | 36.26% | 13.35 | |
| MFS Lifetime 2060 I | 9.87 | 11.04% | N/A | |
| MoA Clear Passage 2060 Fund | N/A | | N/A | |
| T. Rowe Price Retirement 2060 | 11.14 | 25.36% | 12.56 | |

| | | | | |
|---|---|---|---|---|
| Benchmark: Morningstar Lifetime Mod 2060 TR USD | 8.81 | -0.91% | 11.57 | |

114.    By the end of 2020, the JPMorgan TDFs underperformed the Comparator Funds on average by 20.28% on a three-year basis and 13.87% on a five-year basis.

115.    Further, by the end of 2020, the JPMorgan TDFs underperformed the Morningstar benchmark on average by 5.62% on a three-year basis and 8.79% on a five-year basis.

116.    Again, there's no reason why the Plan's fiduciaries should have chosen the JPMorgan TDFs over the many superior performing alternatives. Had the fiduciaries to the Plan been putting the interests of Plan participants first, the JPMorgan TDFs would not have been selected for the Plan.

117.    To make matters worse, the JPMorgan TDFs had some of the worst fund rankings in 2018 and 2020 in its Morningstar Category, which tracks the funds appropriate index, Lifetime Moderate TR USD. This data was available to the Plan fiduciaries before and during the Class Period in real time and does not constitute any sort of hind sight analysis.

| Investment | Percentile Rank 3-Year Return Ending 2018 | Percentile Rank 3-Year Return Ending 2020 | Percentile Rank 5-year Return ending 2018 | Percentile Rank 5-year Return ending 2020 |
|---|---|---|---|---|
| JPMorgan SmartRetirement 2020 A | 84th | 90th | 72nd | 88th |
| JPMorgan SmartRetirement 2025 A | 80th | 84th | 63rd | 84th |
| JPMorgan SmartRetirement 2030 A | 78th | 85th | 66th | 81st |
| JPMorgan SmartRetirement 2035 A | 84th | 88th | 69th | 80th |
| JPMorgan SmartRetirement 2040 A | 81st | 70th | 69th | 74th |
| JPMorgan SmartRetirement 2045 A | 86th | 80th | 70th | 79th |
| JPMorgan SmartRetirement 2050 A | 88th | 79th | 71st | 83rd |

| JPMorgan SmartRetirement 2055A | 88th | 80th | 69th | 86th |
|---|---|---|---|---|
| JPMorgan SmartRetirement 2060 A | | 83rd | | |

118.    Given the long history of underperformance of the JPMorgan TDFs, it is clear that these funds were an imprudent choice and should have been replaced at the start of the Class Period.

119.    Failure to remove the funds caused real and material harm to the Plaintiffs and putative class. Even small differences in returns between the JPMorgan SmartRetirement Series and other funds result in significant loss to the Plan.

120.    There's no justifiable excuse for having allowed the JPMorgan TDFs to be selected as investment options for Plan participants or to languish in the Plan until the end of 2021 without taking any action at all. This issue has nothing to do with any differences in the purpose of the Series or any possible justifiable difference in investment strategy, it's simply evidence of a clearly flawed investment strategy.

121.    By choosing or continuing to include the JPMorgan TDFs in the Plan despite the clear evidence that the funds had a flawed investment strategy as evidenced by the Series' performance for many years prior to the Class Period and during the Class period, it deprived Plan participants of meaningful returns costing them millions of dollars in retirement savings needlessly. The JPMorgan TDFs should never have been selected for the Plan and certainly should not have been permitted to languish in the Plan for years with no action taken by the Plan fiduciaries until the end of 2021, which was simply too little too late.

      **4.**    **The Fees Associated with the JPMorgan TDFs Were Unreasonable Compared to Fees of the Prudent Investment Alternatives**

122.    As noted above, under 29 U.S.C. § 1104(a)(1), a plan fiduciary must give substantial consideration to the cost of investment options. "Wasting beneficiaries' money is imprudent. In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs." Uniform Prudent Investor Act (the "UPIA"), § 7.

123.    Prudent and impartial plan sponsors thus should be monitoring both the performance and cost of the investments selected for their 401(k) plans, as well as investigating alternatives in the marketplace to ensure that well-performing, low cost investment options are being made available to plan participants.

124.    On average, there are lower expense ratios for 401(k) participants than those for other investors. *See The Economics of Providing 401(k) Plans*, at 11. ERISA-mandated monitoring of investments leads prudent and impartial plan sponsors to continually evaluate performance and fees, resulting in great competition among mutual funds in the marketplace. Furthermore, the large average account balances of 401(k) plans, especially the largest ones with over a $1 billion in assets managed, lead to economies of scale and special pricing within mutual funds.

125.    Further, "The Restatement … instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but also in monitoring and reviewing investments.'" *Tibble II*, 843 F.3d at 1197-98.

126.    As represented above, additional fees of only 0.18% or 0.4% can have a large effect on a participant's investment results over time because "[b]eneficiaries subject to higher fees…lose not only money spent on higher fees, but also lost investment opportunity; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time." *Tibble II*, 843 F.3d at 1198 ("It is beyond dispute that the higher the fees charged to a beneficiary, the more the beneficiary's investment shrinks.").

127.    Each of the Target Date year funds had an expense ratio at or in excess of .75%. Compared to the Comparator Funds, this cost was higher than the Comparator Funds, while the JPMorgan TDFs performed worse than the Comparator Funds. The chart below utilizes 2024 expense ratio figures from Morningstar as an exemplar year to demonstrate the discrepancy in expenses.  The degree of the discrepancy in fees between the JPMorgan TDFs and Comparator Funds were similar from 2018 through 2021.  Thus, investment in the JPMorgan TDFs cost Plan participants monetary losses that will impact them over their lifetime:

| Fund in Plan | 2024 Exp. Ratio | Peer Group Funds | 2024 Exp. Ratio | Investment Style | % Fee Excess |
|---|---|---|---|---|---|
| JPMorgan SmartRetirement 2020 A | 0.75% | American Funds 2020 Trgt Date Retire R6 | 0.31% | Target date | 142% |
| | | MFS Lifetime 2020 I | 0.47% | | 60% |
| | | MoA Clear Passage 2020 Fund | 0.45% | | 67% |
| | | T. Rowe Price Retirement 2020 | 0.53% | | 42% |
| JPMorgan SmartRetirement 2025 A | 0.78% | American Funds 2025 Trgt Date Retire R6 | 0.32% | Target date | 144% |
| | | MFS Lifetime 2025 I | 0.47% | | 66% |
| | | MoA Clear Passage 2025 Fund | 0.41% | | 90% |
| | | T. Rowe Price Retirement 2025 | 0.54% | | 44% |
| JPMorgan SmartRetirement 2030 A | 0.79% | American Funds 2030 Trgt Date Retire R6 | 0.33% | Target date | 139% |
| | | MFS Lifetime 2030 I | 0.51% | | 55% |
| | | MoA Clear Passage 2030 Fund | 0.39% | | 103% |
| | | T. Rowe Price Retirement 2030 | 0.57% | | 39% |
| JPMorgan SmartRetirement 2035 A | 0.83% | American Funds 2035 Trgt Date Retire R6 | 0.35% | Target date | 126% |
| | | MFS Lifetime 2035 I | 0.55% | | 51% |
| | | MoA Clear Passage 2035 Fund | 0.36% | | 131% |
| | | T. Rowe Price Retirement 2035 | 0.59% | | 41% |
| JPMorgan SmartRetirement 2040 A | 0.84% | American Funds 2040 Trgt Date Retire R6 | 0.37% | Target date | 127% |
| | | MFS Lifetime 2040 I | 0.57% | | 47% |
| | | MoA Clear Passage 2040 Fund | 0.34% | | 147% |
| | | T. Rowe Price Retirement 2040 | 0.60% | | 40% |
| JPMorgan SmartRetirement 2045 A | 0.85% | American Funds 2045 Trgt Date Retire R6 | 0.37% | Target date | 130% |
| | | MFS Lifetime 2045 I | 0.58% | | 47% |
| | | MoA Clear Passage 2045 Fund | 0.33% | | 158% |
| | | T. Rowe Price Retirement 2045 | 0.62% | | 37% |
| JPMorgan SmartRetirement 2050 A | 0.85% | American Funds 2050 Trgt Date Retire R6 | 0.38% | Target date | 124% |
| | | MFS Lifetime 2050 I | 0.58% | | 47% |
| | | MoA Clear Passage 2050 Fund | 0.34% | | 150% |
| | | T. Rowe Price Retirement 2050 | 0.63% | | 35% |
| JPMorgan SmartRetirement 2055A | 0.85% | American Funds 2055 Trgt Date Retire R6 | 0.38% | Target date | 124% |
| | | MFS Lifetime 2055 I | 0.58% | | 47% |
| | | MoA Clear Passage 2055 Fund | 0.37% | | 130% |

| | | T. Rowe Price Retirement 2055 | 0.64% | | 33% |
|---|---|---|---|---|---|
| JPMorgan SmartRetirement 2060 A | 0.84% | American Funds 2060 Trgt Date Retire R6 | 0.39% | Target date | 115% |
| | | MFS Lifetime 2060 I | 0.57% | | 47% |
| | | MoA Clear Passage 2060 Fund | 0.40% | | 110% |
| | | T. Rowe Price Retirement 2060 | 0.64% | | 31% |

128. On average, the expense ratios for JPMorgan TDFs in the Plan were up to 85% higher than the expense ratios for the Comparator Funds and 39% higher than the Morningstar median expense ratios of all funds in the same category:

| Investment | Expense Ratio | Peer Group Median Expense Ratio | % Fee Excess |
|---|---|---|---|
| JPMorgan SmartRetirement 2030 A | 0.79% | 0.60% | 32% |
| JPMorgan SmartRetirement 2035 A | 0.83% | 0.60% | 38% |
| JPMorgan SmartRetirement 2040 A | 0.84% | 0.64% | 31% |
| JPMorgan SmartRetirement 2045 A | 0.85% | 0.63% | 35% |
| JPMorgan SmartRetirement 2050 A | 0.85% | 0.64% | 33% |
| JPMorgan SmartRetirement 2055A | 0.85% | 0.65% | 31% |
| JPMorgan SmartRetirement 2060 A | 0.84% | 0.64% | 31% |

129. Had the Plan fiduciaries conducted an impartial review of the Plan's investments they would have easily noticed the JPMorgan TDFs were far more expensive than Comparator funds and the Morningstar benchmarks.

**C.    Defendant Breached Its Fiduciary Duties by Improperly Reducing the Company's Plan Contributions Through Forfeiture Accounts**

130. During the Class Period, Defendant breached its ERISA fiduciary duties by misusing the Plan's assets for Defendant's own benefit and to the detriment of Plan participants.

131. All contributions made by Coca-Cola SW were assets of the Plan at the time they were made.

132. Pursuant to the Trust Agreement, "[t]he Employer hereby establishes the Trust to hold assets of the Plan qualified under Section 401(a) of the Internal Revenue Code of 1986, as amended." Trust Agreement, at 1.

133.    Further, "[a]ll deposits to the Plan must be made to the Trust, and all assets of the Plan must be held under the Trust." *Id*.

134.    Finally, "[t]he Trustee will, subject to prior review and approval, accept such contributions of cash or Employer Securities as defined by Code Section 409(1) made by or on behalf of Participants as it receives from time to time from the Employer." *Id*., at 2.

135.    During the Class Period, Defendant breached its ERISA fiduciary duties by misusing the Plan's assets for Coca-Cola SW's benefit and to the detriment of Plan participants.

136.    As alleged above, Defendant had a choice on how to utilize forfeited amounts of nonelective employer contributions. At the discretion of Defendant in its fiduciary capacity, forfeitures may be used to either pay the Plan's expenses or reduce the Company's contributions to the Plan. *See* SPD, at 17.

137.    Using the forfeitures to reduce Coca-Cola SW's contributions is always in the best interest of Coca-Cola SW because that option would decrease its own contribution costs.

138.    Absent any risk that Coca-Cola SW would be unable to satisfy its nonelective contribution obligations, using forfeitures to pay Plan expenses would be in the participants' best interest because that option would reduce or eliminate amounts otherwise charged to their accounts to cover such expenses.

139.    In deciding between using forfeitures of nonelective contributions to benefit Coca-Cola SW or using forfeitures to benefit the participants, Defendant is presented with a conflict of interest in administering the Plan and managing and disposing of the Plan's assets.

140.    Despite the conflict of interest presented by this decision, Defendant failed to undertake any investigation into which option was in the best interest of the Plan's participants and beneficiaries.

141.    Defendant did not, for example, investigate whether there was a risk that Coca-Cola SW would be unable to satisfy its nonelective contribution obligations if forfeitures were used to pay Plan expenses, or evaluate whether there were sufficient forfeitures to eliminate the Plan's expenses charged to participants and still offset a portion of Coca-Cola SW's own nonelective contribution obligations, as a prudent person would have done.

142.    Defendant also failed to consult with an independent, non-conflicted decisionmaker to advise them in deciding upon the best course of action for allocating the forfeitures in the Plan, as a prudent person would have done.

143.    Although ERISA requires fiduciaries to manage the Plan's assets solely in the interest of participants and although the Plan grants Defendant discretion to use forfeitures of nonelective contributions to pay Plan expenses, thereby reducing or eliminating the amounts charged to participant accounts to cover such expenses, Defendant has consistently declined to use the Plan's assets for such purpose during the putative Class Period.

144.    Since at least the beginning of the Class Period, Defendant has improperly used forfeited non-vested Plan assets for Coca-Cola SW's benefit to reduce future employer contributions instead of using the funds to benefit Plan participants.

145.    According to information from the Plan's Form 5500, the following represents the balance in the Plan's forfeiture accounts during the Class Period, the amount of the forfeiture improperly used to offset Coca-Cola SW's contributions to the Plan, and the amounts used to pay for Plan administration costs:

| Year | Forfeiture Balance | Amts. Used to Reduce Future Company Contributions | Amts. Used to Pay Expenses |
|------|-------------------|---------------------------------------------------|----------------------------|
| **2018** | $985,000 | Unknown | Unknown |

| 2019 | $1,300,000 | $1,500,000[18] | $0 |
|---|---|---|---|
| 2020 | $1,618,235 | $996,000[19] | $631 |
| 2021 | $1,315,514 | $1,783,903 | Unknown[20] |
| 2022 | $1,285,111 | $378,993 | Unknown[21] |
| 2023 | $662,238 | $2,461,127[22] | $73,501 |
| Total | | **$8,103,416** | **$74,132** |

146.    Based on the above chart, from the beginning of the Class Period through 2023, up to $8.1 million was improperly steered from paying RKA costs and instead used to benefit the Company.

147.    Defendant effectively placed its own interests above the interests of the Plan and its participants and caused harm to the Plan and its participants by reducing Plan assets, not allocating forfeited funds to Plan participants' accounts, and also caused Plan participants to incur as much as $8.1 million in expenses that could otherwise have been covered in whole or in part by forfeited funds.

---

[18] *See* Independent Auditor's Report attached to 2019 Form 5500 at 6 ("During 2019, Company non-elective contributions were reduced by $1.5 million from using forfeited non-vested accounts.").

[19] *See* Independent Auditor's Report attached to 2020 Form 5500 at 7 ("forfeitures of approximately $996,000 were used to reduce employer contributions and $631 was used to pay Plan expenses.").

[20] *See* Independent Auditor's Report attached to 2021 Form 5500 at 7 ("forfeitures of $1,783,903 were used to reduce employer contributions and pay Plan expenses.").

[21] *See* Independent Auditor's Report attached to 2022 Form 5500 at 11 ("During the year ended December 31, 2022, $1,362,386 of forfeited amounts were used to reduce Plan expenses and Company contributions.").

[22] *See* Independent Auditor's Report attached to 2023 Form 5500 at 8 ("Forfeitures of $2,461,127 were used to reduce employer matching contributions and forfeitures of $73,501 were used to pay plan administrative expenses.").

148.    Additionally, based on the fact that in 2019, 2021 and 2023 the amount of offset exceeded the balance of the forfeiture accounts, it is likely the Company used forfeiture funds from prior years to offset Company contributions. This is a violation of IRS and general ERISA requirement that forfeitures are to be exhausted during the year in which they are incurred.

## COUNT I
## Breaches of Fiduciary Duty of Prudence

149.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

150.    At all relevant times, the Company ("Prudence Defendant") was a fiduciary of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that it exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

151.    As a fiduciary of the Plan, the Defendant was subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a). These fiduciary duties included managing the assets of the Plan for the sole and exclusive benefit of Plan participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

152.    The Prudence Defendant breached these fiduciary duties in multiple respects as discussed throughout this Complaint. Prudence Defendant did not make decisions regarding the Plan's investment lineup based solely on the merits of each investment and what was in the interest of Plan participants. Instead, the Prudence Defendant selected and retained investment options in the Plan despite the high cost of the funds in relation to other comparable investments.

153.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered millions of dollars of losses due to excessive costs and lower net investment returns. Had Defendant complied with its fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

154.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Prudence Defendant is liable to restore to the Plan all losses caused by its breaches of fiduciary duties, and also must restore any profits resulting from such breaches. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendant's breaches as set forth in their Prayer for Relief.

155.    The Prudence Defendant knowingly participated in each breach, knowing that such acts were a breach, and failed to make any reasonable and timely effort under the circumstances to remedy the breaches.

## COUNT II
### Breach of Fiduciary Duty of Loyalty

156.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

157.    At all relevant times, the Company ("Loyalty Defendant") was a fiduciary of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that it exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

158.    As a fiduciary of the Plan, the Company was subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a).

159.    Pursuant to 29 U.S.C. § 1104(a)(1)(A), the Loyalty Defendant was required to discharge its duties to the Plan "solely in the interest of the participants and beneficiaries" and "for

the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan."

160.    The Loyalty Defendant failed to exercise its duty of loyalty to the Plan and its participants by utilizing forfeited funds in the Plan for the benefit of the Company instead of the sole interest of the Plan participants and beneficiaries.

161.    The Loyalty Defendant used these Plan assets for the purpose of reducing the Company's own contributions to the Plan, thereby saving the Company millions of dollars each year at the expense of the Plan which received decreased Company contributions and its participants and beneficiaries were forced to incur avoidable expense deductions to their individual accounts.

162.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered millions of dollars of losses.

163.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Loyalty Defendant is liable to restore to the Plan all losses caused by its breaches of fiduciary duties, and also must restore any profits resulting from such breaches. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendant's breaches as set forth in their Prayer for Relief.

## **PRAYER FOR RELIEF**

136.    WHEREFORE, Plaintiffs pray that judgment be entered against Defendant on all claims and requests that the Court awards the following relief:

A.    A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(2) of the Federal Rules of Civil Procedure;

B.    Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.      A Declaration that the Defendant has breached its fiduciary duties under ERISA;

D.      An Order compelling the Defendant to make good to the Plan all losses to the Plan resulting from Defendant's breaches of its fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendant made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendant had fulfilled its fiduciary obligations;

E.      An order requiring the Company to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, as necessary to effectuate said relief, and to prevent the Defendant's unjust enrichment;

F.      Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.      An order enjoining Defendant from any further violations of its ERISA fiduciary responsibilities, obligations, and duties;

H.      Other equitable relief to redress Defendant's illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of Plan fiduciaries deemed to have breached their fiduciary duties;

I.      An award of pre-judgment interest;

J.      An award of costs pursuant to 29 U.S.C. § 1132(g);

K.      An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

L.      Such other and further relief as the Court deems equitable and just.

Dated: August 11, 2025                    Respectfully submitted,


                                          **WARD + WHITE PLLC**
                                          *Daniel L. White*
                                          Daniel L. White, Esquire
                                          TX Attorney ID #24090588
                                          114 ½ E. Louisianna Street
                                          Suite 206
                                          McKinney, TX  75069
                                          Email: dwhite@wardwhitepllc.com
                                          Tel.: (469) 941-0040

                                          **CAPOZZI ADLER, P.C.**
                                          Mark K. Gyandoh, Esquire
                                          PA Attorney ID #88587
                                          James A. Maro, Esquire
                                          PA Attorney ID #86420
                                          (*Admitted Pro Hac Vice*)
                                          312 Old Lancaster Road
                                          Merion Station, PA 19066
                                          Email: markg@capozziadler.com
                                                 jamesm@capozziadler.com
                                          Tel.: (610) 890-0200
                                          Fax: (717) 233-4103

                                          *Counsel for Plaintiffs and the Putative Class*

## CERTIFICATE OF SERVICE

I hereby certify that on this 11th day of August, 2025, I electronically filed a copy of the foregoing using the CM/ECF system which will send a notification to all counsel of record in this Action.

/s/ Mark K. Gyandoh
Mark K. Gyandoh