**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **MONICA DEL BOSQUE, JENNA RODRIGUEZ, FABIOLA SOLIS-GARAY, NICOLE WARE, and PHILIP WATTERSON, Individually and on behalf of all others similarly situated,** | § § § § § | |
| | § | **CIVIL ACTION NO. 3:25-cv-01270-X** |
| **Plaintiffs,** | § § | |
| **v.** | § § | |
| **COCA-COLA SOUTHWEST BEVERAGES LLC,** | § § § | |
| **Defendants.** | § § | |

**DEFENDANT COCA-COLA SOUTHWEST BEVERAGES LLC'S
MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS
PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)
AND TO STAY DISCOVERY**

176036014.1

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT .................................................................................. 1

STATEMENT OF FACTS ALLEGED ...................................................................... 3

    I.     The Company's 401(k) Plan .................................................................. 3

    II.    TDFs and the Plan's Investments ........................................................ 5

    III.   The Alleged Comparator TDFs ........................................................... 6

    IV.   Plaintiffs' Claims ................................................................................. 7

LEGAL ARGUMENT ................................................................................................ 7

    I.     Standard on a Motion to Dismiss Under FRCP 12(b)(6) ..................... 7

    II.    Plaintiffs have not Plausibly Alleged a Breach of the Duty of Prudence .............. 8

          A.    The Comparator Funds do not Provide a "Meaningful Benchmark" for the JPMorgan TDFs .................................................. 9

          B.    JPMorgan TDFs' Alleged Underperformance is not Sufficient to Infer Imprudence ..................................................... 17

          C.    Plaintiffs' Excessive Fees Allegations Fail to State a Claim .................... 20

          D.    The Company's Use of Forfeited Funds Was Not Imprudent ................. 22

    III.   Plaintiffs' Disloyalty Claim Fails to State a Claim Upon Which Relief Can be Granted .............. 24

    IV.   Plaintiffs' Claims are Time-Barred in Whole or in Part ....................... 29

    V.    The Court Should Stay Discovery Pending Decision of the Instant Motion or, in the Alternative, Bifurcate Discovery to Determine the Statute of Limitations Issue .............. 31

CONCLUSION ........................................................................................................... 34

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re 2014 Radioshack ERISA Litig.*,
    165 F. Supp. 3d 429 (N.D. Tex. 2016) ...................................................................29

*Aguilar v. National Production Workers Union Severance Trust Plan*,
    2019 WL 9514732 (C.D. Ca. Nov. 1, 2019)............................................................31

*Albert v. Oshkosh Corporation*,
    47 F.4th 570 (7th Cir. 2022) ............................................................................10, 21

*Anderson v. Intel Corporation Investment Policy Committee*,
    137 F.4th 1015 (9th Cir. 2025) ....................................................................... *passim*

*Ashcroft v. Iqbal*,
    556 U.S. 662, 129 S. Ct. 1937 (2009).....................................................7, 8, 22, 34

*Babcock v. Hartmarx Corp.*,
    182 F.3d 336 (5th Cir. 1999) ................................................................................29

*Beldock v. Microsoft*,
    2023 WL 1798171 (W.D. Wash. Feb. 7, 2023).....................................................15

*Beldock v. Microsoft Corporation*,
    2023 WL 3058016 (W.D. Wash. April 24, 2023) ...........................................16, 17

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544, 127 S. Ct. 1955 (2007)............................................................ *passim*

*Bozzini v. Ferguson Enterprises LLC*,
    22-cv-05667-AMO, 2025 WL 1547617 (N.D. Cal. May 29, 2025).......................29

*Cain v. Siemens Corp.*,
    2025 WL 2172684 (D. N.J. July 31, 2025).......................................................24, 28

*Colonna v. LoanDepot.com LLC*,
    2024 WL 5047875 (Dec. 9, 2024) .................................................................32, 33

*Davis v. Wash. Univ. in St. Louis*,
    960 F.3d 478 (8th Cir. 2020) ................................................................................12

*Dimou v. Thermo Fisher Sci. Inc.*,
    2024 WL 4508450 (S.D. Cal. Sept. 19, 2024).......................................................28

*Fifth Third Bancorp v. Dudenhoeffer*,
    573 U.S. 409 (2014) ..................................................................................9

*Fujita v. United States*,
    416 F. App'x 400 (5th Cir. 2011) ..........................................................31

*Hecker v. Deere & Co.*,
    556 F.3d 575 (7th Cir. 2009) ..................................................................18

*Hughes v. Nw. Univ.*,
    142 S. Ct. 737 (2022) .......................................................................8, 9, 19

*Hutchins v. HP, Inc.*,
    737 F. Supp. 3d 851 (N.D. Cal. 2024) ............................................ *passim*

*Hutchins v. HP, Inc.*,
    767 F. Supp. 3d 912 (N.D. Cal. 2025) ............................................ *passim*

*JSW Steel (USA) Inc. v. Nucor Corp.*,
    586 F. Supp. 3d 585 (S. D. Tex. 2022) ....................................................8

*Kopp v. Klein*,
    894 F.3d 214 (5th Cir. 2018) ..................................................................24

*Lalonde v. Massachusetts Mutual Insurance Company*,
    728 F. Supp. 3d 141 (D. Mass. 2024) ...............................................21, 22

*Lee v. Verizon Commc'ns., Inc.*,
    837 F.3d 523 (5th Cir. 2016) ....................................................................9

*Locascio v. Fluor Corporation*,
    22-cv-01540X, 2023 WL 320000 (N.D. Tex. Jan. 18, 2023) ...............9, 10, 12, 17

*Matney v. Barrick Gold of N. Am.*,
    80 F.4th 1136 (10th Cir. 2023) .........................................................9, 14, 22

*Matousek v. MidAmerican Energy Co.*,
    51 F.4th 274 (8th Cir. 2022) ........................................................9, 14, 21, 22

*McWashington v. Nordstrom, Inc.*,
    C24-1230 TSZ, 2025 WL 1736765 (W.D. Wash. June 23, 2025) ...............25, 26

*Meiners v. Wells Fargo & Co.*,
    898 F.3d 820 (8th Cir. 2018) ...............................................................10, 12

*Middleton et al. v. Amentum Parent Holdings, LLC*,
    2025 WL 2229959 (D. Kan. Aug. 5, 2025) ...........................................23, 24

iii

*Ortiz v. Am. Airlines, Inc.*,
    No. 16-151, 2020 WL 4504385 (N.D. Tex. Aug. 5, 2020)......................................17

*Parmer v. Land O'Lakes*,
    518 F. Supp. 3d 1293 (D. Minn. 2021) ...........................................................12, 13

*Perkins v. United Surgical Partners International, Inc.*,
    2024 WL 1574342 (5th Cir. April 11, 2024) ..........................................................8

*Primesource Building Products, Inc. v. Lee Group International, Inc.*,
    2020 WL 6140462 (N.D. Tex. Aug. 12, 2020) (Starr, J.).....................................31

*Quigley on behalf of ConocoPhillips Savings Plan v. ConocoPhillips Company*,
    756 F.Supp.3d 479 (S.D.Tex. 2024) .....................................................................31

*Sec'y of Lab. V. Fitzsimmons*,
    805 F.2d 682 (7th Cir. 1986) (en banc) ................................................................27

*Singh v. Deloitte LLP*,
    650 F. Supp. 3d 259 (S.D.N.Y. 2023)...................................................................22

*Smith v. CommonSpirit*,
    37 F.4th 1160 (6th Cir. 2022).......................................................................*passim*

*Sonnier v. State Farm Mut. Auto Ins.*,
    509 F.3d 673 (5th Cir. 2007) ..................................................................................3

*Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v.
    Morgan Stanley Inv. Mgmt. Inc. ("St. Vincent")*,
    712 F.3d 705 (2d Cir. 2013)...................................................................8, 9, 19, 32

*Sweda v. Univ. of Pa.*,
    923 F.3d 320 (3d Cir. 2019)..................................................................................21

*Tullgren v. Hamilton*,
    2023 WL 2307615 (E.D. Va. March 1, 2023) ......................................................18

*White v. Chevron Corp.*,
    2016 WL 4502808 (N.D. Cal. Aug. 29, 2016), *aff'd,* 752 Fed. Appx. 453 (9th
    Cir. 2018)................................................................................................................9

*White v. Chevron Corp.*,
    2017 WL 2352137 (N.D. Ca. May 31, 2017), *aff'd.,* 752 Fed. Appx. 453 (9th
    Cir. 2018)..............................................................................................................19

*White v. Chevron Corp.*,
    752 Fed. Appx. 453 (9th Cir. 2018)..........................................................9, 14, 18

*Wright v. Oregon Metallurgical Corp.*,
　360 F.3d 1090 (9th Cir. 2004) ...................................................................25

**Statutes**

29 U.S.C. § 1002(2)(A) ..............................................................................3

29 U.S.C. § 1104 .......................................................................................7

29 U.S.C § 1104(a)(1)(A) ..........................................................................24

29 U.S.C. § 1104(a)(1)(B) ..........................................................................8

29 U.S.C. § 1113(1) ...................................................................................30

29 U.S.C. § 1113(2) .............................................................................29, 32

29 U.S.C. § 1144(d) ..................................................................................26

Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001, *et seq.* ................. *passim*

ERISA § 413 .............................................................................................30

ERISA § 413(2) ...................................................................................29, 30

Tax Reform Act of 1986, Pub. L. No. 99-514, 100 Stat. 2085 ...................26

**Other Authorities**

Dep't of Labor, *A Look at 401(k) Plan Fees*,
　https://www.dol.gov/node/63354#:~:text=As%20a%20participant%20you%2
　0may,continue%20to%20be%20appropriate%20choices (last visited August
　25, 2025) ...............................................................................................20

Dep't of Labor, *Target Date Retirement Funds – Tips for ERISA Plan Fiduciaries*
　(Feb. 2013), https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-
　activities/resource-center/fact-sheets/target-date-retirement-funds-erisa-plan-
　fiduciaries-tips.pdf (last visited August 25, 2025) .....................................2

Dep't of Treasury, *Use of Forfeitures in Qualified Retirement Plans*, 88 Fed. Reg.
　12282-01, 12283 (proposed Feb. 27, 2023) ...............................................26

Dictionary.com, *Mediocre*, https://www.dictionary.com/browse/mediocre (last
　visited August 25, 2025) ..........................................................................11

Fed. R. Civ. P. 12(b)(6) .........................................................................8, 32

Fed. R. Civ. P. 26(c) ................................................................................31

176036014.1

H.R. Rep. No. 99-841 (1986) ............................................................................................. 25

John Rekenthaler, *The Active vs. Passive Framework, Updated*,
    https://www.morningstar.com/columns/rekenthaler-report/active-vs-passive-
    framework-updated (last accessed August 22, 2025) .............................................................. 6

176036014.1

Defendant Coca-Cola Southwest Beverages LLC ("Defendant" or the "Company"), by and through its attorneys, respectfully submits this Memorandum of Law in support of its motion (1) to dismiss the amended complaint in the instant action filed by plaintiffs Monica Del Bosque, Jenna Rodriguez, Fabiola Solis-Garay, Nicole Ware, and Philip Watterson (the "Amended Complaint"), pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure ("FRCP"), for failure to state a claim upon which relief can be granted, and (2) to stay discovery pending the resolution of the instant motion, or, in the alternative, to bifurcate discovery to permit Defendant to fully develop its statute of limitations defenses prior to having to engage in full merits discovery.[1]

## PRELIMINARY STATEMENT

Plaintiffs' Amended Complaint should be dismissed as a matter of law because plaintiffs have failed to state a claim upon which relief can be granted. The Amended Complaint contains no more than vague, conclusory, and argumentative assertions that Defendant has allegedly breached its fiduciary duties under the Employee Retirement Income Security Act of 1974 ("ERISA") with respect to the Company-sponsored 401(k) plan. Consequently, Plaintiffs' assertions are insufficient to withstand the instant motion.

Plaintiffs Monica Del Bosque ("Del Bosque"), Jenna Rodriguez ("Rodriguez"), Fabiola Solis-Garay ("Solis-Garay), and Philip Watterson ("Watterson") (collectively, "Plaintiffs"), individually and on behalf of similarly situated participants in the Coca-Cola Southwest Beverages 401(k) plan (the "Plan"), attempt to allege that the Defendant breached its fiduciary duties of

---

[1] On August 18 (Dkt. No. 23), Defendant filed a motion to enlarge the page limit for the instant motion to dismiss the Amended Compalint. The motion is unopposed and agreed-to by Plaintiffs who requested a reciprocal increase in their page limit for opposition. While the motion to enlarge is still pending with the Court, Defendant notes that the Court previously granted Defendant's request on July 21 (Dkt. No. 18) when Defendant moved to dismiss the original complaint.

loyalty and prudence under ERISA because it selected, as part of its retirement investment plan fund lineup, certain JPMorgan SmartRetirement target date funds ("JPMorgan TDFs") instead of other mutual funds, so-called "Comparator Funds," that allegedly performed better over certain periods of time and had lower costs. Plaintiffs refer to the "Comparator Funds" trying to show that the JPMorgan TDFs were imprudently selected by Defendant as investment options available to the Plan's participants. However, Plaintiffs' Amended Complaint fails to demonstrate that these "Comparator Funds" are sufficiently meaningful benchmarks to the funds being challenged – the JPMorgan TDFs.

A determination of imprudence cannot "comedown to simply pointing to a fund with a better performance." *Smith v. CommonSpirit*, 37 F.4th 1160, 1167 (6th Cir. 2022). "There are considerable differences among TDFs offered by different providers, even among TDFs with the same target date. For example, TDFs may have different investment strategies, glide paths, and investment-related fees." Dep't of Labor, *Target Date Retirement Funds – Tips for ERISA Plan Fiduciaries* (Feb. 2013), https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/fact-sheets/target-date-retirement-funds-erisa-plan-fiduciaries-tips.pdf (last visited August 25, 2025). The Department of Labor explains that these factors – strategies, glide paths, and fees – can "significantly affect the way a TDF performs." *Id.* As detailed below, Plaintiffs' failure to identify sufficient similarities between the JPMorgan TDFs and the so-called "Comparator Funds" is fatal to Plaintiffs' imprudence claims.

Plaintiffs further assert that Defendant acted imprudently by keeping the JPMorgan TDFs in the Plan lineup of investment options even though those funds allegedly charged higher fees than the "Comparator Funds." As with the underperformance imprudence claims, however, simply stating that "fees could be lower" does not make Plaintiffs' claims plausible. Thus, as with the

2

underperformance claim, Plaintiffs have failed to state a legally cognizable claim for excessive fees. Finally, Plaintiffs allege that Defendant breached its fiduciary duty of loyalty by allegedly misusing the Plan's assets – specifically, monies forfeited by certain Plan participants – as part of the Company's non-elective contributions to the Plan, instead of using those assets to defray administrative expenses. However, this disloyalty claim is also subject to dismissal because, among other things, Plaintiffs fail to allege that Defendant was prohibited by the Plan or the law from applying forfeited funds towards Defendant's contributions to the Plan.

## STATEMENT OF FACTS ALLEGED[2]

I.     **The Company's 401(k) Plan**

Defendant makes, markets, and distributes bottled beverages in Texas and parts of Oklahoma, New Mexico, and Arkansas. Amended Complaint ("AC") ¶ 28. Defendant sponsors a 401(k) plan, effective April 1, 2017, which is a defined contribution plan, or individual account plan, retirement plan established pursuant to 29 USC § 1002(2)(A). *Id.* ¶¶ 2, 28, 38, 39. Defendant is a named Plan fiduciary. *Id.* ¶¶ 28-29. Eligible participants (those employees having over 30 days of service with the Company) can make tax-deferred contributions from their salaries to the Plan. *Id.* ¶¶ 2, 40. Plaintiffs all participated in the Plan during the Class Period. *Id.* ¶ 26. Plaintiffs Del Bosque and Watterson invested in the JPMorgan SmartRetirement 2040A fund in the Plan. *Id.* ¶¶ 21, 25. Plaintiff Rodriguez invested in the JPMorgan SmartRetirement 2055A fund in the Plan. *Id.* ¶ 22. Plaintiff Solis-Garay invested in the JPMorgan SmartRetirement 2060 fund in the Plan. *Id.*¶

---

[2] At the motion to dismiss stage, the well-plead facts set forth in the Amended Complaint are taken to be true. *Sonnier v. State Farm Mut. Auto Ins.*, 509 F.3d 673, 675 (5th Cir. 2007). Thus, for purposes of this motion, this "Statement of Facts Alleged" is based on facts alleged in the Amended Complaint, materials attached and/or incorporated by reference into the Amended Complaint, and all publicly available materials. Accordingly, Defendant does not concede that any of the allegations contained in the Amended Complaint are true or accurate.

23. The Amended Complaint does not identify which fund(s) in the Plan, if any, Plaintiff Ware invested in. *Id.* ¶ 24.

The Plan provides individual accounts to each participant, which consists of (1) the amount contributed to those accounts and (2) any income, expenses, gains and losses, and forfeitures which may be allocated to the participant's account. AC ¶ 38. Participants may contribute up to 50% of their salary, subject to the maximum amount permitted under the law. *Id.* ¶ 41. Participants who are 50 years of age or older may be eligible to make "catch-up" contributions – contributions in addition to the maximum otherwise permitted. *Id.* ¶ 42. Plan participants may also contribute amounts representing distributions from other qualified defined benefit or defined contribution plans. *Id.* ¶ 43. Participants are 100% vested in their voluntary contributions. *Id.* ¶ 49.

The Company makes "safe harbor matching contribution[s] each payroll period equal to 100% of [participant's[] first 3% of [their] pre-tax salary deferral contributions, plus 50% of the next 6% of [their] salary deferral contributions up to a maximum of 9% of [their] salary." AC ¶ 44. The Company also may choose to make an annual nonelective contribution. *Id.* ¶ 45. Participants become 100% vested in the safe harbor matching contributions and nonelective contributions after completing two years of service at the Company, or after they reach the age of 65, become permanently disabled, or die. *Id.* ¶ 50-51. The portion of a participant's account that has not yet vested at the time a participant leaves the Company is considered a "forfeiture." *Id.* ¶¶ 52. These forfeitures may be used to restore participant accounts, offset Plan expenses, or reduce nonelective contributions. *Id.* ¶ 53. As of December 31, 2023, the Plan had 11,150 total participants and $543,218,631 in total assets. *Id.* ¶ 12-13.

## II.    TDFs and the Plan's Investments

Plan participants were offered several funds for investment each year during the Class Period.  AC ¶ 56. For 2018, the Plan offered 22 investment options, including 14 mutual funds worth $240,943,644. *Id.* By the end of 2018, the Plan's assets totaled $411,345,008. *Id.* ¶ 57. This amount increased to $543,218,631 by the end of 2023. *Id.* ¶ 58. The Plan's investment options included the JPMorgan TDFs.  *Id.* ¶ 56. The JPMorgan TDFs were, until November 2021, the only target date investment options in the Plan. *Id.* ¶ 106. Target date funds are designed to provide a single diversified investment vehicle for plan participants. *Id.* ¶ 79. The target date refers to the participant's expected retirement year. *Id.* These types of investments are attractive to plan participants who do not want to actively manage their retirement savings and may periodically convert to more conservative holdings as the retirement date approaches. *Id.* ¶ 84. The rebalance of the fund's portfolio occurs based on the fund's "glide path." *Id.* ¶ 85. A "glide path" determines how a fund's target asset allocations across underlying securities are expected to change over time and how they become more conservative as the retirement date approaches. *Id.*

Multiple types of assets are included in a target date fund portfolio. *Id.* ¶ 83. This includes equity (stock) and fixed income (bond) securities. *Id.* Target date funds are divided into two broad categories: "to" funds or "through" funds. *Id.* ¶ 87. "To" target date funds are designed to allocate the underlying assets to the most conservative investments at the year of expected retirement. *Id.* "Through" target date funds continue their glidepath progression to reach their most conservative asset allocation past the expected retirement date. *Id.* The "through" method focuses on life expectancy of the participant rather than retirement date. *Id.* The JPMorgan TDFs in the Plan were "Through" funds. *Id.* ¶ 88.

Target date funds are also classified as "actively" or "passively" managed. *Id.* ¶ 89. If the fund is actively managed, the portfolio manager attempts to select stocks or bonds to generate

176036014.1

investment returns that exceed the relevant benchmark index return. *Id.* If the fund is passively managed, the portfolio manager attempts to mimic the stocks and bonds portfolio of a relevant benchmark index.[3] *See* https://www.morningstar.com/columns/rekenthaler-report/active-vs-passive-framework-updated (last accessed August 22, 2025) (passive "indicates a fund that does not reflect an investment view, as its portfolio merely copies that of a market."). While actively managed funds require the portfolio manager to perform a significant amount of research and exercise discretion regarding which stocks and bonds to include in the portfolio, passive funds do not. *Id.* Because of this, passive funds generally charge a lower investment management fee and have a lower "expense ratio" relative to actively managed funds. *Id.* The JPMorgan TDFs are a blend of passive and active management. *Id.* ¶ 101.

## III.    The Alleged Comparator TDFs

The Amended Complaint identifies four allegedly suitable Comparator Funds to support Plaintiffs' position that the JPMorgan TDFs underperformed industry-accepted benchmarks for TDFs. *Id.* ¶ 99. The four alleged comparator funds Plaintiffs identified are: (1) American Funds target date suite, (2) MFS Lifetime target date suite, (3) MoA Clear Passage target date suite, and (4) T. Rowe Price Retirement target date suit. (collectively, the "Comparator Funds"). *Id.* These Comparator Funds were selected from categories created and identified by Morningstar. *Id.* ¶ 100. Plaintiffs further allege that Morningstar placed each of the funds in these suites in the Target Date Category because they concentrate their holdings in the large blend/risk return category. *Id.* For

---

[3] The Amended Complaint states "With a passively managed fund, the portfolio manager attempts to mimic the **performance** of a relevant benchmark index." ¶ 89 (emphasis added). Since this is clearly not an inaccurate description of a passively managed fund, it should not be accepted as true for purposes of the instant motion to dismiss.

176036014.1

that reason, Plaintiffs assert that these funds are accurate comparators. *Id.* The Comparator Funds also are all actively managed. *Id.* ¶ 101.

## IV.    Plaintiffs' Claims

Plaintiffs assert that Defendant breached its fiduciary duties for failing to review the Plan's investment portfolio with due care to ensure the prudence of each investment, in terms of cost and performance, and failing to defray reasonable expenses of administering the Plan. AC ¶ 15. Plaintiffs claim that Defendant mismanaged the Plan to the detriment of its participants and beneficiaries and, thus, breached its fiduciary duties of prudence and loyalty, in violation of 29 U.S.C. § 1104. *Id.* ¶ 16. With respect to their imprudence claim, Plaintiffs allege that the JPMorgan TDFs consistently underperformed the Comparator Funds identified.  *Id.* ¶ 110. Plaintiffs also claim that each of the JPMorgan TDFs had an expense ratio at or in excess of .75%, which was allegedly higher than the expense ratios of the Comparator Funds. *Id.* ¶ 127. Finally, Plaintiffs assert that the Defendant breached its duty of loyalty when Defendant allegedly used forfeited, non-vested Plan assets to reduce future Company contributions to the Plan. *Id.* ¶ 160.

## LEGAL ARGUMENT

## I.    Standard on a Motion to Dismiss Under FRCP 12(b)(6)

To survive a motion to dismiss under FRCP 12(b)(6), a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The plausibility standard requires "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). If a complaint contains facts that are "merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (*quoting Twombly*, 550 U.S. at 557). Further, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

When evaluating ERISA claims for breach of fiduciary duty under FRCP 12(b)(6), courts apply the pleading standards described in *Ashcroft* and *Twombly* by evaluating the allegations in the complaint "as a whole" and "giv[ing] due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise." *Hughes v. Nw. Univ.*, 142 S. Ct. 737, 742 (2022); *Perkins v. United Surgical Partners International, Inc.*, 2024 WL 1574342 (5th Cir. April 11, 2024) ("The well-settled pleading standards articulated in *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937 (2009) and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955 (2007), apply to duty of prudence claims brought under ERISA.").

ERISA "does not give the federal courts a broad license to second-guess the investment decisions of retirement plans." *Smith v. CommonSpirit*, 37 F.4th 1160, 1162 (6th Cir. 2022). A fiduciary's decisions are evaluated "based upon information available to the fiduciary at the time of each investment decision and not from the vantage point of hindsight." *Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc. ("St. Vincent")*, 712 F.3d 705, 716 (2d Cir. 2013). "When faced with two possible explanations for a defendant's conduct, only one of which results in liability, a plaintiff cannot offer allegations that are 'merely consistent with' their favored explanation but are also consistent with the alternative explanation." *JSW Steel (USA) Inc. v. Nucor Corp.*, 586 F. Supp. 3d 585, 595 (S. D. Tex. 2022) (quoting *Twombly*, 550 U.S. at 57).

## II.    Plaintiffs have not Plausibly Alleged a Breach of the Duty of Prudence

In the First Count of the Amended Complaint, Plaintiffs attempt to assert a claim, pursuant to 29 U.S.C. § 1104(a)(1)(B), for breach of the ERISA fiduciary duty of prudence. Specifically, Plaintiffs allege that, as a result of the Defendant's failure to prudently monitor the JPMorgan TDFs' performance and investment fees, the Plan incurred significant losses. AC ¶ 153.

Pursuant to 29 U.S.C § 1104(a)(1)(B), when managing an employee benefit plan:

> [a] fiduciary shall discharge his duties with respect to a plan solely
> in the interest of the participants and beneficiaries and… (B) with
> the care, skill, prudence, and diligence under the circumstances then
> prevailing that a prudent man acting in a like capacity and familiar
> with such matters would use in the conduct of an enterprise of a like
> character and with like aims.

This standard requires a "focus on a fiduciary's conduct in arriving at an investment decision, not on its results, and ask[s] whether a fiduciary employed the appropriate methods to investigate and determine the merits of a particular investment." *White v. Chevron Corp.*, 2016 WL 4502808, at *5 (N.D. Cal. Aug. 29, 2016), *aff'd,* 752 Fed. Appx. 453 (9th Cir. 2018) (*quoting St. Vincent*, 712 F.3d at 716) ; *Lee v. Verizon Commc'ns., Inc.*, 837 F.3d 523, 541-42 (5th Cir. 2016) ("the test of fiduciary prudence 'is one of conduct, not results.'"); *Locascio v. Fluor Corporation*, 22-cv-01540X, 2023 WL 320000, at *4 (N.D. Tex. Jan. 18, 2023) (Starr, J.) ("the prudence standard normally focuses on the fiduciary's conduct in making investment decisions, and not on results."). "Because the content of the duty of prudence turns on 'the circumstances…prevailing' at the time the fiduciary acts," courts must take a "careful, context-sensitive scrutiny of a complaint's allegations" to "divide the plausible sheep from the meritless goats." *Hughes*, 142 S. Ct. at 742; *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014). As demonstrated herein, Plaintiffs' imprudence claims are nothing but "meritless goats," and, thus, should be dismissed as a matter of law.

### A.    The Comparator Funds do not Provide a "Meaningful Benchmark" for the JPMorgan TDFs

When assessing imprudence, several Circuit Courts around the country have held that a plaintiff must set forth a meaningful benchmark to survive a motion to dismiss. *See, e.g., Matousek v. MidAmerican Energy Co.*, 51 F.4th 274, 279 (8th Cir. 2022) ("the key to stating a plausible excessive fees claim is to make a like-for-like comparison" which requires sound and meaningful benchmarking.); *Matney v. Barrick Gold of N. Am.*, 80 F.4th 1136 (10th Cir. 2023) ("to raise an

inference of imprudence...a plaintiff has the burden to allege a 'meaningful benchmark.'")
(internal citation omitted); *Albert v. Oshkosh Corporation*, 47 F.4th 570, 573 (7th Cir. 2022) ("In
the absence of more detailed allegations providing a 'sound basis for comparison,' the plaintiff
could not plausibly plead imprudence"); *Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 822 (8th
Cir. 2018) (To plausibly allege that "a prudent fiduciary in like circumstances would have selected
a different fund based on the cost or performance of the selected fund, a plaintiff must provide a
sound basis for comparison – a meaningful benchmark.").

While the Fifth Circuit has not directly adopted the meaningful benchmark standard, this
Court has explained that these "meaningful benchmarks are important" to understanding and
asserting an imprudence claim. *Locascio*, 2023 WL 320000, at *6 (Starr, J.). Moreover, Plaintiffs
themselves have, in fact, conceded that there is a meaningful benchmark standard that should be
applied to their claims. AC ¶ 70 ("With respect to investment returns, diligent investment
professionals monitor the performance of their selected investments using appropriate industry-
recognized 'benchmarks' and prudently managed equivalents."); *id.* ¶ 92 ("With respect to
investment returns...diligent investment professionals monitor the performance of their selected
target date funds using appropriate industry-recognized 'benchmarks' and prudently managed
equivalents.").

To be a "meaningful benchmark," the Comparator Funds identified by Plaintiffs must have
more than "some similarities" to the JPMorgan TDFs. *Meiners*, 898 F.3d at 823. While the Fifth
Circuit has not yet specifically defined what qualifies as a "meaningful benchmark," there has been
some guidance. *Locascio*, 2023 WL 320000, at *6 (Starr, J.). In *Locascio*, this Court explained
that "courts have reasoned that distinguishing between actively and passively managed accounts
is important to determine a meaningful benchmark. Additionally, benchmark funds with similar

investment strategy can aid in an analysis of a meaningful benchmark." *Id.* As explained below, in the present case, Plaintiffs' allegations that the Defendant breached its fiduciary duty of prudence fail because the Comparator Funds identified by Plaintiffs do not provide a "meaningful benchmark" for evaluating the performance of the JPMorgan TDFs.

As an initial matter, Plaintiffs concede that the performance histories of the JPMorgan TDFs "were *mediocre* when compared to their appropriate peer groups." AC ¶ 91 (emphasis added); AC ¶ 109 ("the JPMorgan series was mediocre at best from 2014."). Plaintiffs' use of the term "mediocre" is telling because while there are a variety of definitions of the term "mediocre," it is never defined as being the "worst." Rather, "mediocre" typically stands for average or middle-of-the-road. *See* https://www.dictionary.com/browse/mediocre (last visited August 25, 2025) (defining "mediocre" as "of only ordinary or moderate quality; neither good nor bad."). Thus, the Plaintiffs are not even claiming that the performance of the JPMorgan TDFs was bad or poor.

Nevertheless, Plaintiffs assert that the JPMorgan TDFs "lagged behind the performance of the applicable Comparator Funds for many years before the inception of the Class Period clearly showing that it was an imprudent choice for the Plan." AC ¶ 108. The purported Comparator Funds include the American Funds target date suite, the MFS Lifetime target date suite, the MoA Clear Passage target date suite, and the T. Rowe Price Retirement target date suite. *Id.* ¶¶ 98-99. Plaintiffs assert that the funds are sufficient comparators since "Morningstar places the four Comparator Funds and the JPMorgan TDFs in the Lifetime Moderate Index category because the underlying holdings of each fund match the risk return profile of this category." *Id.* ¶ 100. Plaintiffs refer to the "Morningstar graphs at Appendix 'A,'" which allegedly demonstrates that "all five funds concentrate their holdings in the large blend risk/return category." *Id.* However, it is not at all clear what "Appendix A" Plaintiffs are referring to as they provide no link or citation to the Appendix.

As such, any proposition for which Plaintiffs rely on these graphs should not be accepted as true for purposes of this motion. Even if these purported graphs were to demonstrate an overlap in a Morningstar category, such overlap does not make Plaintiffs' claims more plausible.

Additionally, Plaintiffs identify certain characteristics that the JPMorgan TDFs and the Comparator Funds allegedly share. For example, according to the Amended Complaint, the JPMorgan TDFs and the Comparator Funds each have a "through" glide path, invest in both stocks and bonds, invest in both foreign and U.S. securities, and "pursue the same investment strategies." *Id.* ¶¶ 98(a)-(d). The problem with Plaintiffs' allegations, however, is that they are insufficient to demonstrate that these alleged Comparator Funds are meaningful benchmarks to the JPMorgan TDFs. Here, like in *Locascio*, Plaintiffs have not alleged sufficient facts to infer that the Comparator Funds are meaningful benchmarks to the JPMorgan TDFs. *See Locascio*, 2023 WL 320000, at *6 ("[Plaintiff] needs to provide meaningful comparison in his pleadings to demonstrate that his selected funds are sufficiently similar benchmarks. From here, [plaintiff] can more accurately analyze the process by which the Defendants selected and retained the Fluor TDFs and the other Challenged Investments.").

The Amended Complaint asserts very broad-stroke similarities between the JPMorgan TDFs and the Comparator Funds as to their respective investment strategies, asset allocations, and fund management. *See* AC ¶¶ 98(a)-(d). However, simply stating that two TDFs invest in stock and bond securities or U.S. and international securities, is insufficient to allege a meaningful benchmark. *See, e.g., Meiners*, 898 F.3d at 823 n. 2 (finding no meaningful benchmark where challenged TDFs had a "higher allocation of bonds."); *Davis v. Wash. Univ. in St. Louis*, 960 F.3d 478, 485-86 (8th Cir. 2020) (affirming dismissal of challenge to fund that invested in higher percentage of international stocks than purported comparators); *Parmer v. Land O'Lakes*, 518 F.

12

Supp. 3d 1293, 1306 (D. Minn. 2021) (dismissing complaint where each fund's prospectus confirmed that each fund held different concentrations of bonds).

Moreover, while Plaintiffs attempt to assert that the JPMorgan TDFs and the Comparator Funds are similarly managed, this attempt falls short. Plaintiffs allege that the Comparator Funds are all actively managed while the JPMorgan TDFs are a blend of both passive and active management. AC ¶ 101. Despite the clear difference in blended management versus strictly active management, Plaintiffs then confusingly assert "the Comparator Funds and the JPMorgan SmartRetirement Series have active management." *Id.* Not only is this obviously not true based on the Amended Complaint's own concession that the JPMorgan TDFs use a blended management style, and are not just passively or actively managed, but this distinction makes a significant difference in determining whether the Comparator Funds are meaningful benchmarks. In fact, Plaintiffs incorrectly assert that whether a fund is passively or actively managed is not material to the Court's assessment of the Comparator Funds as meaningful benchmarks. *See* AC ¶ 102 ("for purposes of comparing the JPMorgan TDFs and the Comparator funds it matters little whether the funds are actively or passively managed because their underlying asset allocations are similar (*e.g.* equity v. fixed income) and all the target date funds have the same investment objective."). This alone warrants dismissal of Plaintiffs' imprudence claim as management style – active v. passive v. blended – makes a large difference in a fund's strategy and goals. *See, e.g. Parmer*, 518 F. Supp. 3d at 1306 (dismissing claims because challenged TDFs used a "blended strategy of primarily active management with passive management," while plaintiffs comparators used "wholly passive" or "wholly active" strategies).

A fund's aims and goals, as well as its investment strategies, allocations of investments, and risks and potential rewards are all significant factors to consider in determining whether a

13

particular fund or group of funds provides a meaningful benchmark. Where these aims and goals, investment strategies, allocations of investments, and/or risks and potential rewards are different, the particular group of funds offered for comparison do not provide a meaningful benchmark. *See Anderson v. Intel Corporation Investment Policy Committee*, 137 F.4th 1015, 1023 (9th Cir. 2025) (finding no meaningful benchmark where "comparators were not truly comparable because they had 'different aims, different risks, and different potential rewards.'"); s*ee, e.g., CommonSpirit*, 37 F.4th at 1167 ("each fund has distinct goals and distinct strategies" making a "side-by-side comparison of how two funds performed…with no consideration of their distinct objectives" unhelpful for determining the prudent choice.); *Matney v. Barrick Gold of North America*, 80 F.4th 1136, 1154 (10th Cir. 2023) (same); *Matousek*, 51 F.4th at 282 (claim dismissed where comparators were "just different" and the complaint lacked "details [as to] whether they hold similar securities, have similar investment strategies, and reflect a similar risk profile."); *Anderson*, 137 F.4th at 1025 ("court[s] ha[ve] to assess the similarities and differences between" funds to "determine whether they [are] appropriate comparators in the first place.").

Plaintiffs' failure to sufficiently identify these investment strategies, allocations of investments, and risks and potential rewards make it impossible for the Court to plausibly infer from the allegations in the Amended Complaint that the Comparator Funds are meaningful benchmarks with respect to the JPMorgan TDFs. Since the Plaintiffs have not articulated a meaningful benchmark with respect to the JPMorgan TDFs' performance or costs, the Court should dismiss the Plaintiffs' claims for breach of the fiduciary duty of prudence.

The Ninth Circuit's holding in *White v. Chevron* is instructive. In *White*, the Court concluded that the plaintiffs allegations were insufficient to plausibly infer that the defendant acted imprudently because the plaintiffs "showed only that [the defendant] could have chosen different

14

vehicles for investment that performed better during the relevant period, or sought lower fees for administration of the fund" and that "none of the allegations made it more probable than not that any breach of a fiduciary duty had occurred." 752 Fed. Appx. 453, 455 (9th Cir. 2018).

Similarly, in *Beldock v. Microsoft*, 2023 WL 1798171 (W.D. Wash. Feb. 7, 2023) ("*Beldock I*"), the court held that the plaintiffs "fail[ed] to raise their claim above a speculative level" where the plaintiffs did not allege any facts that "would 'tend to exclude the possibility' that [d]efendants had reasons to retain" the TDF that "were consistent with their fiduciary duties." 2023 WL 1798171, at *7. Instead, the plaintiffs in *Beldock I*, like the Plaintiffs in the instant matter, simply "ask the court to infer, based on the quarterly charts of three- and five-year annualized returns they present in their complaints, that Defendants must have breached their fiduciary duty of prudence when they did not divest from the" TDF at issue. *Id.* Indeed, the five-year snapshots upon which Plaintiffs rely in the instant matter[4] "do not suffice to plausibly plead an imprudent decision" in the context of a "fund that is supposed to grow for fifty years." *CommonSpirit*, 37 F.4th at 1166. Moreover, "[p]recipitously selling a well-constructed portfolio in response to disappointing short-term losses, as it happens, is one of the surest ways to frustrate the long-term growth of a retirement plan." *Id.* Absent more allegations, Plaintiffs fail to raise their claim above a merely speculative level. *Twombly*, 550 U.S. at 555.

Further, it is well established that a fiduciary is not required to adopt a riskier investment strategy simply because that strategy may obtain higher returns. This was confirmed recently by

---

[4] Plaintiffs' Amended Complaint contains several charts with information purportedly showing the JPMorgan TDFs' performance over three-year and five-year periods. However, they do not identify the source(s) of this information. Defendant's counsel reviewed the Morningstar website in an effort to assess the accuracy Plaintiffs' claims but was unable to locate the source of the data. The Court need not accept Plaintiffs' data as true for purposes of this motion because of Plaintiffs' failure to adequately identify the source of the data and information contained in their Amended Complaint.

the Ninth Circuit in *Anderson v. Intel Corporation Investment Policy Committee*. There, the Court
explained:

> Anderson argues that there are "*no* meaningful comparators for the
> fiduciaries' decision" because Intel's approach "was unusual, if not
> unparalleled." That argument conflates the risk-mitigation objective
> of the Intel funds with the allocation decisions made to implement
> that objective. Anderson's complaint suggests that what he is really
> challenging is the former: He alleges that "in pursuing a purported
> risk-mitigation strategy, the Intel Funds gave up the long-term
> benefit of investing in equity, which delivers superior returns." But
> as the district court noted, "ERISA fiduciaries are not required to
> adopt a riskier strategy simply because that strategy may increase
> returns." To the contrary, courts have routinely rejected claims that
> an ERISA fiduciary can violate the duty of prudence by seeking to
> minimize risk.

137 F.4th at 1023-24. Here, as in *Anderson*, there can be no argument that fiduciaries are required
to assume higher risk simply because returns may be higher. Thus, to the extent Plaintiffs seek to
make such an argument, it must be given short shrift.

Finally, even if Plaintiffs were to seek an opportunity to further amend their pleading, any
amendment would be futile. For example, further amending their pleading to include metrics
related to the "Sharpe ratio" and the S&P Target Date Indices would not help Plaintiffs' pleading
failures. As alleged in the amended complaint in *Beldock v. Microsoft Corporation*, the Sharpe
ratio "represents the additional amount of return that an investor receives per unit increase of risk."
*Beldock v. Microsoft Corporation*, 2023 WL 3058016, at *2 (W.D. Wash. April 24, 2023)
("*Beldock II*"). The Sharpe ratio "is computed by comparing a fund manager's outperformance of
the risk-free rate to the standard deviation of the manager's performance" and it "enables the
comparison of suites with disparate equity and fixed income allocations as well as both 'to' and
'through' management styles (each resulting in varying levels of risk) by controlling for those
differences." *Id.* at *2 (internal citation omitted).

In *Beldock II*, the plaintiffs alleged that the S&P Target Date Indices are "a composite of the disparate strategies and styles present in the broad universe of investible alternative TDFs" and they "represent an appropriate, meaningful benchmark comparator." *Id.* However, the court in *Beldock II* held that these metrics would not save Plaintiffs' claim as they would simply be adding "'additional measurements of investment performance' beyond those Plaintiffs included in their original complaint." *Id.* at *3. Such allegations are still "based solely on the [] TDFs' alleged poor performance during a brief timeframe" and "without more" are insufficient "to raise Plaintiffs' claim above the level of speculation and into plausibility." *Id.*

As this Court has recognized, "[s]imply labeling funds as 'comparable' or 'a peer' is insufficient to establish that those funds are meaningful benchmarks against which to compare the performance of' the allegedly imprudent funds." *Locascio*, 2023 WL 320000, at *6 (Starr, J.) (*quoting Anderson*, 2021 WL 229235, at *8, *aff'd*, 137 F.4th 1015 (9th Cir. 2025)); *Ortiz v. Am. Airlines, Inc.*, No. 16-151, 2020 WL 4504385, at *14 (N.D. Tex. Aug. 5, 2020) (McBryde, J.) ("making a bare allegation does not mean anything without a meaningful benchmark."). Plaintiffs here have not provided sufficient allegations to compare the JPMorgan TDFs with the Comparator Funds. As a result, the Comparator Funds should not be deemed meaningful benchmarks, and Plaintiffs' imprudence claim for underperformance should be dismissed.

## B.    JPMorgan TDFs' Alleged Underperformance is not Sufficient to Infer Imprudence

In addition to Plaintiffs' failure to sufficiently identify a "meaningful benchmark" for the JPMorgan TDFs at issue, Plaintiffs' allegations of underperformance alone are not sufficient to maintain Plaintiffs' imprudence claim. Plaintiffs allege no facts about the process Defendant used for selecting and monitoring the JPMorgan TDFs. Instead, Plaintiffs ask the Court to infer that the process was flawed because the Comparator Funds allegedly performed better and had lower fees

than the JPMorgan TDFs. However, such a broad assertion alone does not plausibly state a claim for imprudence. While underperformance can certainly be a factor in assessing the prudence of an investment, such allegation in isolation is not sufficient to maintain a claim of imprudence.

The Sixth Circuit, in *CommonSpirit*, 37 F.4th at 1167, explained that a claim of imprudence cannot "come down to simply pointing to a fund with better performance:"

> That a fund's underperformance, as compared to a meaningful benchmark, may offer a building block for a claim of imprudence is one thing. But it is quite another to say that it suffices alone, especially if the different performance rates between the funds may be explained by a different investment strategy.

*Id.* Other Circuits have held similarly, dismissing claims as deficient because allegations that a fiduciary "could have chosen different vehicles for investment that performed better during the relevant period" do not make it "more plausible than not that any breach of a fiduciary duty had occurred." *White*, 752 Fed. Appx. at 455. Likewise, courts have frequently rejected allegations that simply amount to "the fees could be lower." *See infra* II(C); *see, e.g, Hecker v. Deere & Co.*, 556 F.3d 575, 586 (7th Cir. 2009) ("The fact that it is possible that some other funds might have had even lower cost ratios is beside the point; nothing in ERISA requires every fiduciary to scour the market to find and offer the cheapest possible fund (which might, of course, be plagued by other problems.").

In *CommonSpirit*, a participant alleged that fiduciaries acted imprudently by offering actively managed investment funds when index funds were available which had higher returns and lower fees. 37 F.4th at 1164. In *CommonSpirit*, the Sixth Circuit held that such allegations of higher returns and lower fees were insufficient to infer a fiduciary breach. *Id.*; s*ee also Tullgren v. Hamilton*, 2023 WL 2307615, at *6 (E.D. Va. March 1, 2023) (dismissing imprudence claim where plaintiff did not provide any factual allegations from which the court could infer that the choice of the TDF was imprudent). "ERISA simply does not provide a cause of action for fiduciary breaches

176036014.1

based solely on a fund participant's disappointment in the fund performance." *Tullgreen*, 2023 WL 2307615, at *6. Any alleged underperformance during a three-or five-year period, without more, does not suggest that offering the JPMorgan TDFs was outside the "'range of reasonable judgments'" that a fiduciary may make. *Id.* (quoting *Hughes*, 142 S. Ct. at 742).

Plaintiffs have not offered facts to support any contention that Defendant employed imprudent methods to select the funds as part of the Plan lineup. Instead, Plaintiffs simply provide four alleged Comparator Fund suites and assert that they "performed better." As a matter of law, this is insufficient to state a claim for breach of fiduciary duty under ERISA. Indeed, it is possible a fiduciary "may reasonably select an investment alternative in view of its different risks and features, even if that investment option turns out to yield less than some other option." *White v. Chevron*, 2017 WL 2352137, at *10 (N.D. Ca. May 31, 2017), *aff'd.*, 752 Fed. Appx. 453 (9th Cir. 2018).

Yet, Plaintiffs here have failed to offer any facts in connection with Defendant's selection of the JPMorgan TDFs, or any facts showing that the process by which Defendant chose the JPMorgan TDFs was somehow flawed. This is fatal to Plaintiffs' imprudence claim. *Id.* (dismissing imprudence claim where "plaintiffs [were] unable to allege any facts showing that the Plan fiduciaries failed to consider the advantages and disadvantages of various types of capital preservation funds before deciding to offer a money market fund to Chevron Plan participants."); *Pension Benefit Guar. Corp. ex rel. St. Vincent v. Morgan Stanley Inv. Mgmt.*, 712 F.3d 705, 716 (2nd Cir. 2013) (prudence analysis focuses on fiduciary's "conduct in arriving at an investment decision, not on its results, and ask[s] whether a fiduciary employed the appropriate methods to investigate and determine the merits of a particular investment"). While generally plaintiffs may lack "extensive information regarding the fiduciary's 'methods and actual knowledge' because

those details 'tend to be in the sole possession of [that fiduciary]],'" an ERISA plaintiff receives extensive disclosures which can be used to show whether "a prudent fiduciary in like circumstances would have acted differently." *Anderson*, 137 F.4th at 1025-26 (internal citations omitted). Plaintiffs have not even attempted to make such allegations here.

Finally, to the extent Plaintiffs seek to rely on the purported fund rankings in 2018 and 2020 in support of their imprudence argument, as alleged in paragraph 117 of the Amended Complaint, this reliance is misplaced. Plaintiffs appear to have intentionally omitted the fund rankings in 2019. However, the relative performance of the JPMorgan TDFs in 2019 would seem highly relevant to the Plaintiffs' allegation that the Defendant breached its fiduciary duty by including the JPMorgan TDFs in the Plan's fund lineup for that year and any subsequent year. For example, if the JPMorgan TDFs performed well in 2019, should the Defendant have removed the JPMorgan TDFs in 2020?   By not including the fund rankings and performance for 2019, even the Plaintiffs' underperformance allegations are incomplete and defective.

For the foregoing reasons, Plaintiffs' underperformance allegations should be dismissed for failure to state a claim upon which relief can be granted.

### C.    Plaintiffs' Excessive Fees Allegations Fail to State a Claim

Plaintiffs allege Defendant acted imprudently by investing in the JPMorgan TDFs because the JPMorgan TDFs "had an expense ratio at or in excess of .75% compared to the Comparator Funds…while the JPMorgan TDFs performed worse than the Comparator Funds." AC ¶ 127. The U.S. Department of Labor has advised individuals who participate in their employer's 401(k) plan to not "**consider fees in a vacuum**." Dep't of Labor, *A Look at 401(k) Plan Fees*, https://www.dol.gov/node/63354#:~:text=As%20a%20participant%20you%20may,continue%20to%20be%20appropriate%20choices (last visited August 25, 2025) (emphasis in original).

According to the U.S. Department of Labor, "[fees] are only one part of the bigger picture including investment risk and returns and the extent and quality of services provided." *Id.*

As with underperformance claims, "[t]he key to stating a plausible excessive-fees claim is to make a like-for-like comparison." *Matousek*, 51 F.4th at 279; *see also Oshkosh*, 47 F.4th at 579-80; *cf Sweda v. Univ. of Pa.*, 923 F.3d 320, 330 (3d Cir. 2019) (plaintiffs plausibly alleged a breach of fiduciary duty claim where the plan spent millions more than "similar plans" "for the same services"). "In the absence of 'significant allegations of wrongdoing,' the way to plausibly plead a claim of this type is to identify similar plans offering the same services for less." *Matousek*, 51 F.4th at 279. Plaintiffs have not done so here. In fact, as with the underperformance claim, Plaintiffs have not identified any ways in which the fees collected by JPMorgan are similar to those collected by the Comparator Funds; they have only stated that JPMorgan collects more fees.

The Seventh Circuit's decision in *Albert v. Oshkosh* supports the dismissal of Plaintiffs' excessive fees claim. In *Oshkosh*, the Seventh Circuit affirmed the dismissal of an imprudence claim based on excessive fees on the grounds that the plaintiffs' allegations were threadbare. The Court explained that simply alleging that "Defendants failed to consider materially similar and less expensive alternatives to the Plan's investment options" was insufficient to state an imprudence claim as there was no "sound basis for comparison." 47 F.4th at 582. Similarly, here, Plaintiffs have provided no "sound basis for comparison" between the JPMorgan TDF fees and the Comparator Funds' fees.

Plaintiffs' inclusion of the "Median Expense Ratio" (AC ¶128) fares no better than Plaintiffs' conclusory allegations relating to the Comparator Funds. Indeed, "industry average ratios are an insufficient benchmark because 'the mere fact that a fund charges an expense ratio higher than the mean or median…does not imply that the cost was excessive…[o]therwise, by

definition, half of all funds would charge excessive fees.'" *Lalonde v. Massachusetts Mutual Insurance Company*, 728 F. Supp. 3d 141, 156 (D. Mass. 2024) (quoting *Singh v. Deloitte LLP*, 650 F. Supp. 3d 259, 268 (S.D.N.Y. 2023)); *see also Matney v. Barrick Gold of North America*, 80 F.4th 1136, 1155 (10th Cir. 2023) ("A comparison to median expense ratios in broad investment strategy categories, without more, does not provide the meaningful benchmark necessary to satisfy a plaintiff's pleading burden in this context. A median expense ratio derived from a broad range of funds—for example, all funds within the domestic equity investment category—reveals no information about how the specific funds within that category operate."); *Matousek*, 51 F.4th at 282 ("There is no way to compare the large universe of funds—about which we know little—to the risk profiles, return objectives, and management approaches of the funds in MidAmerican's lineup.... [T]he aggregate data fails 'to connect the dots in a way that creates an inference of imprudence.'") (citation omitted). Thus, Plaintiffs' reference to the median expense ratio of all the funds in the same Morningstar category as the JPMorgan TDFs does nothing to bolster Plaintiffs' claim, nor does it save Plaintiffs' insufficient excessive fees claim from dismissal.

Accordingly, Plaintiffs' imprudence claim as it relates to alleged excessive fees falls short of the plausibility standard set forth in *Twombly* and *Iqbal* and should be dismissed.

### D.    The Company's Use of Forfeited Funds Was Not Imprudent

Although it is not entirely clear whether Plaintiffs seek to do so, to the extent Plaintiffs are attempting to allege that Defendant's use of the Plan's forfeited funds towards its matching contributions is imprudent, such claim must fail. Utilizing forfeited funds towards a company's nonelective contributions is neither imprudent nor, as explained below (*infra* III), a breach of the duty of loyalty.

A "fiduciary duty is fulfilled where the fiduciary ensures that participants have received their promised benefits." *Hutchins v. HP, Inc.*, 767 F. Supp. 3d 912, 924 (N.D. Cal. 2025) ("*Hutchins II*"). If the terms of the ERISA plan are legal, "the plan fiduciary is not authorized to provide Plan participants with *more* benefits than the Plan documents set out." *Id.* Here, Plaintiffs concede that the forfeited funds "can be used to: (1) restore participant accounts; (2) offset Plan expenses; *or* (3) reduce *any* nonelective contributions." AC ¶ 53 (emphasis added). Thus, Defendant's alleged use of forfeited funds to reduce Company contributions is consistent with the Plan documents and, therefore, not improper. Here, holding Defendant's use of the forfeited funds to be imprudent would create an entirely new benefit to Plaintiffs, which is not permitted.

The recent holding in *Middleton et al. v. Amentum Parent Holdings, LLC*, 2025 WL 2229959 (D. Kan. Aug. 5, 2025) is instructive on this point. In *Middleton*, like here, plaintiffs alleged that the defendants breached their fiduciary duties of prudence and loyalty by applying forfeitures to reduce the defendant's contribution instead of applying the forfeitures to reduce administrative expenses. The plaintiffs contended that "[d]efendants failed to engage in a reasoned and impartial decision-making process to determine that using forfeited funds to reduce their contribution expenses, as opposed to administrative expenses, was in the best interest of the [p]lans' participants." *Id.* at *12. The court in *Middleton* dismissed the imprudence and disloyalty claims where the plan terms allowed for the use of the forfeited funds towards both company contributions and administrative fees, holding: "Plaintiffs do not allege that Defendants violated the Plans' terms...The Plan language also does not dictate an order of priority. If the Court were to adopt Plaintiffs' theory, it would effectively create the benefit of paying Plaintiffs' administrative costs." *Id.* The plaintiff's theory of liability, the court explained, is "contrary to the settled

understanding of Congress and the Treasury Department regarding defined contribution plans." *Id.* at *15 (citation omitted).

The same reasoning used by the court in *Middleton* would hold true in the instant litigation where, as previously noted, the Plan allows for forfeited funds to be used towards matching contributions or administrative costs. As such, any purported claim of imprudence relating to Defendant's use of forfeited funds must be dismissed. *See also Hutchins v. HP, Inc.*, 737 F. Supp. 3d 851, 863 (N.D. Cal. 2024) ("*Hutchins I*"); *Hutchins II*, 767 F. Supp. 3d at 927; *Cain v. Siemens Corp.*, 2025 WL 2172684, at * 4 (D. N.J. July 31, 2025) (collecting cases).

## III.    Plaintiffs' Disloyalty Claim Fails to State a Claim Upon Which Relief Can be Granted

In the Second Count of the Amended Complaint, Plaintiffs assert that Defendant was disloyal to the Plan participants by allegedly utilizing forfeited funds in the Plan for the benefit of the Company instead of for the sole interest of the participants and beneficiaries. AC ¶ 130. Specifically, Plaintiffs allege that Defendant used Plan assets to reduce the Company's future contributions "instead of using the funds to benefit Plan participants" by, for example, using the forfeited funds to offset administrative and recordkeeping costs. *Id.* ¶¶ 144, 146. Plaintiffs assert that Defendant was faced with a conflict of interest when it needed to choose between using the forfeited funds to offset plan expenses or to satisfy Defendant's nonelective contribution obligations. *Id.* ¶¶ 138-139. As demonstrated herein, Plaintiffs have not sufficiently alleged that Defendant breached its fiduciary duty of loyalty.

To maintain an action for disloyalty, a plaintiff must show that the plan fiduciary failed to "discharge his duties with respect to a plan solely in the interest of participants and beneficiaries and …for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses administering the plan[.]" 29 U.S.C § 1104(a)(1)(A); *Kopp v. Klein*, 894 F.3d 214, 221 (5th Cir. 2018) (in affirming dismissal of the plaintiffs' complaint, the

court quoted ERISA § 404(a)(1)(A)). However, that "fiduciary duty is fulfilled where the fiduciary ensures that participants have received their promised benefits." *Hutchins II*, 767 F. Supp. at 924.

The law is clear that a fiduciary does not breach its duties when it complies with a lawful plan document. *Wright v. Oregon Metallurgical Corp.*, 360 F.3d 1090, 1100 (9th Cir. 2004). "ERISA does no more than protect the benefits which are due to an employee under a plan." *Id.* Thus, "it is neither disloyal nor imprudent under ERISA to fail to maximize pecuniary benefits" with respect to administrative costs because ERISA creates no "unqualified duty" for plan fiduciaries to pay those costs. *Hutchins I*, 737 F. Supp. 3d at 863.

In the present case, Plaintiffs concede that, under the Plan, forfeited nonelective contributions "can be used to: (1) restore participant accounts; (2) offset Plan expenses; ***or*** (3) reduce ***any*** nonelective contributions." AC ¶ 53 (emphasis added). In addition, under the Plan, forfeitures of matching contributions "can be used to: (1) restore participants accounts; ***or*** (2) reduce ***any*** matching contributions." *Id.* ¶ 54 (emphasis added). Thus, Defendant's alleged use of forfeited funds to reduce Company contributions is consistent with the Plan documents and, therefore, not improper.

Moreover, it is well established that a Company's use of forfeited funds to reduce employer contributions under a retirement plan is permitted and commonly accepted. Several district courts have found this to be true based on a February 2023 IRS proposed regulation which "would require qualified defined-contribution plans in which forfeitures may occur to provide that the forfeited funds will be used for specifically enumerated purposes, one of which could be 'to reduce employer contributions under the plan.'" *McWashington v. Nordstrom, Inc.,* C24-1230 TSZ, 2025 WL 1736765, at * 14 (W.D. Wash. June 23, 2025) (*quoting Hutchins I*, 737 F. Supp. 3d at 863); *see also Hutchins II*, 767 F. Supp. 3d at 923. When noticing this proposed regulation, the IRS

referenced a Conference Report in which Congress was advised when "enacting the Tax Reform Act of 1986 ('TRA 86'), that, following the changes effectuated by TRA 86, 'forfeitures arising in any defined contribution plan…can be either (1) reallocated to the accounts of other participants in a nondiscriminatory fashion, or (2) used to reduce future employer contributions or administrative costs.'" *McWashington*, 2025 WL 1736765, at *14 (*quoting* 88 Fed. Reg. at 11283) (*quoting* H.R. Rep. No. 99-841, at II-442 (1986)).

The February 2023 proposed regulation specifically provides:

> Consistent with changes made by TRA 86 providing uniform rules for the use of forfeitures in defined contribution plans (as described in the Conference Report), the proposed regulations would clarify that forfeitures arising in any defined contribution plan (including in a money purchase pension plan) may be used for one or more of the following purposes, as specified in the plan: (1) to pay plan administrative expenses, (2) to reduce employer contributions under the plan, or (3) to increase benefits in other participants' accounts in accordance with plan terms.

88 Fed. Reg. 12282 at 12283. Moreover, the ERISA statute expressly states:

> Nothing in this subchapter shall be construed to alter, amend, modify, invalidate, impair, or supersede any law of the United States…or any rule or regulation issued under any such law.

29 U.S.C. § 1144(d). Thus, an ERISA fiduciary cannot be held liable if it complies with federal regulations, and any contrary position would "abrogate Treasury regulations" and change "over 38 years of settled rules regarding defined contribution plans." *Hutchins I*, 737 F. Supp. 3d at 864.

In *McWashington*, the plaintiffs alleged that the defendant committee's failure to use money in a "forfeiture suspense account" to defray administrative expenses constituted a breach of the committee's duties of loyalty and prudence. 2025 WL 1736765, at *13. In rejecting this argument, the court explained, *inter alia*, that "the underlying premise of plaintiffs' forfeiture-related causes of action is implausible." *Id.* The *McWashington* court relied upon the language in the February 2023 IRS proposed regulation – which was also relied upon by the court in *Hutchins*

26

*I* and *Hutchins II* for similar forfeiture claims – and dismissed the plaintiff's disloyalty claim, stating that a  plausible claim of disloyalty requires plaintiffs to "plead something more than an ordinary use of forfeited funds to pay future employer contributions, or in other words, behavior that is not consistent with the practices of perhaps all 401(k) plan fiduciaries." 2025 WL 1736765, at * 14.

Furthermore, the U.S. Secretary of Labor agrees with the position that the use of forfeited funds as part of an employer's contribution to the plan is not a breach of the duty of loyalty. In fact, recently, the Plan Benefits Security Division, Office of the Solicitor of the U.S. Department of Labor, submitted an amicus brief in *Hutchins v. HP Inc.*, in support of the defendant-appellee's position that the use of forfeited funds to make employer contributions is permitted. *See Brief for the U.S. Secretary of Labor as Amicus Curiae Supporting Defendant-Appellee* (the "DOL Amicus Brief"), *Hutchins v. HP Inc.*, Case No. 25-826 (Dkt. No. 24.1). As stated in the DOL Amicus Brief, "[t]he Secretary of Labor ("Secretary") has the primary authority to interpret and enforce Title I of ERISA and is responsible for 'assur[ing] the…uniformity of enforcement of the law under the ERISA statutes." *See* DOL Amicus Brief, p. 1 quoting *Sec'y of Lab. V. Fitzsimmons*, 805 F.2d 682, 691-93 (7th Cir. 1986) (en banc). The DOL Amicus Brief expressly states, "[t]he established understanding for several decades has been that defined contribution plans, such as the Plan…may allocate forfeited employer contributions to pay benefits for remaining participants rather than using those funds to defray administrative expenses." *Id.* at p. 1. Thus, the Secretary of Labor clarified its "view that a fiduciary's use of forfeited employer contributions in the manner alleged in this case, without more, would not violate ERISA." *Id.*

Finally, Plaintiffs' Amended Complaint contains allegations that Defendant was faced with a conflict of interest when it needed to decide what to do with the forfeited funds: pay the Plan's

expenses or reduce the Company's nonelective contributions to the Plan. AC ¶ 136. Plaintiffs assert, therefore, that the Company's decision to use forfeited funds to contribute towards the Company's nonelective contributions – instead of paying plan expenses – was a violation of the duty of loyalty. However, these allegations fail to state a disloyalty claim. The decision in *Hutchins II* is on point. There, the plaintiff similarly argued that the defendant's use of forfeited funds to pay matching contributions was a breach of the fiduciary duty of loyalty based on a conflict of interest. The court, however, disagreed and dismissed the disloyalty claim, holding that the mere existence of a potential conflict of interest does not "automatically amount[] to a breach of ERISA's fiduciary duty of loyalty." *Id.* at 925.

The court in *Hutchins II* explained that potential conflicts arise frequently in the administration of ERISA plans and that a plaintiff must "provide specific facts that move the needle on his claim from 'speculative' to 'plausible.'" *Id.* As with the plaintiff in *Hutchins II*, Plaintiffs here have not alleged any specific facts that make the disloyalty claim "plausible." Furthermore, like in *Hutchins II*, the forfeitures alleged here did not revert to Defendant. Instead, they were used to provide benefits to participants that are required under the Plan. Moreover, "there is no allegation that Plaintiff or any Plan participant did not receive the benefits due under the Plan." *Id.*

In short, Plaintiff's "theory of liability is 'too broad to be plausible.'" *Cain*, 2025 WL 2172684, at * 4 (D. N.J. July 31, 2025) (*citing Dimou v. Thermo Fisher Sci. Inc.*, 2024 WL 4508450, at *9 (S.D. Cal. Sept. 19, 2024). Accepting Plaintiff's theory would "impose liability beyond the requirements of ERISA." *Id.* Indeed, "[b]y Plaintiff's logic, a fiduciary would always be required to use [f]orfeitures to pay administrative costs even if the plan gave it the option to reallocate those funds to reduce employer contributions." *Id.* Such requirement would "impose

categorical liability anytime a company chose to use forfeitures to reduce its own contributions" (*id.* at *5) and courts have consistently declined to impose such liability.

Accordingly, since Plaintiffs have asserted nothing more than a broad allegation that Defendant's *permissible* use of forfeited funds to contribute to the Company's nonelective contribution constitutes a breach of the fiduciary duty loyalty, the claim must be dismissed. *See Bozzini v. Ferguson Enterprises LLC*, 22-cv-05667-AMO, 2025 WL 1547617, at *2 (N.D. Cal. May 29, 2025) ("According to Plaintiffs, '[b]y exercising discretion to direct forfeited funds only for the [p]lan's benefit rather than the benefit of [p]lan participants, Defendants violated their duty of loyalty to [p]lan participants. More is required to state a viable claim for breach of the duty of loyalty.") (internal citation omitted); *Hutchins I*, 737 F. Supp. 3d at 862-63 ("Plaintiff's theory would require any fiduciary to use forfeited amounts to pay administrative costs regardless of any such context or circumstances. This broad allegation is implausible because it would improperly extend ERISA beyond its bounds and would be contrary [to] the settled understanding of Congress and the Treasury Department regarding defined contribution plans like the one at issue in this case.").

## IV.    Plaintiffs' Claims are Time-Barred in Whole or in Part

Under the ERISA statute, suits for breaches of fiduciary duty must be filed within one of two time periods, each with different triggering events. ERISA Section 413(2), 29 U.S.C. §1113(2), requires a plaintiff to initiate a suit within three years of when the plaintiff gains "actual knowledge" of the alleged breach or violation of the statute. In the Fifth Circuit, "actual knowledge requires that the [Plaintiffs] know not only of the events constituting the breach, but 'also that those events supported a claim for breach of fiduciary duty or violation under ERISA.'" *Babcock v. Hartmarx Corp.*, 182 F.3d 336, 339 (5th Cir. 1999); *In re 2014 Radioshack ERISA Litig.*, 165 F. Supp. 3d 429, 497-98 (N.D. Tex. 2016) ("A plaintiff has 'actual knowledge' of the breach or

violation within the meaning of ERISA § 413(2), 29 U.S.C. § 1113(2), when they have knowledge of *all* material facts necessary to understand that an ERISA fiduciary has breached his or her duty or otherwise violated the Act"). This 3-year actual knowledge statute of limitations may well apply to Plaintiffs in the instant matter.

In their Amended Complaint, Plaintiffs state the funds at issue, the JPMorgan TDFs, were the only target date investment option offered under the Plan until November 17, 2021. AC ¶ 106. Indeed, the Plaintiffs acknowledge that the JPMorgan TDFs were removed by the Defendant as an investment option on that date, when the assets in the JPMorgan TDFs were transferred to BlackRock LifePath Index series target date funds. *Id.* n. 9, n. 17. Since the Plaintiffs received notice of the elimination of the JPMorgan TDFs from the Plan investment lineup – and, thus, notice of those funds' final performance and costs as an investment option for the Plan – more than three years before they filed the Complaint, Plaintiffs' claims related to those JPMorgan TDFs may all be barred by the 3-year statute of limitations.

At a minimum, however, Plaintiffs' claims relating to the JPMorgan TDFs should be barred to the extent that those claims involve alleged breaches that occurred more than six (6) years before the filing of the Complaint. ERISA Section 413 provides, in part, that a plaintiff must initiate litigation under the statute:

> [s]ix years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission the latest date on which the fiduciary could have cured the breach or violation.

29 U.S.C. § 1113(1).

As an initial matter, Plaintiffs define the "Class Period" as October 28, 2018, through the date of judgment. AC ¶ 30. The start of the Class Period falls outside of the six-year statute of limitations under 29 U.S.C. § 1113(1) as six years prior to the initiation of the instant litigation

would be May 20, 2019. There are several allegations in Plaintiffs' Amended Complaint that refer to alleged imprudence or disloyalty prior to May 20, 2019. *E.g.* AC ¶¶ 110-111, 117, 127. Plaintiffs' Amended Complaint also contains allegations regarding fund performance and management dating back to 2018. *See* AC pp. 28-32 (charts). Any such allegations are untimely and should be dismissed as any conduct that occurred prior to May 20, 2019 is outside the six-year statute of limitations. 29 U.S.C §1113(1). *See, e.g., Quigley on behalf of ConocoPhillips Savings Plan v. ConocoPhillips Company*, 756 F.Supp.3d 479, 494 (S.D.Tex. 2024) (breach of fiduciary duty claims are time barred because claim is "premised on acts or omissions that occurred more than six years before they filed suit."); *Aguilar v. National Production Workers Union Severance Trust Plan*, 2019 WL 9514732, at *3 (C.D. Ca. Nov. 1, 2019) (dismissing claims as untimely to the extent they were based on conduct occurring outside of the six-year statute of limitations).

## V.    The Court Should Stay Discovery Pending Decision of the Instant Motion or, in the Alternative, Bifurcate Discovery to Determine the Statute of Limitations Issue

Federal Rule of Civil Procedure 26(c) permits a district court to "make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Fed. R. Civ. P. 26(c). This includes the district court's "broad discretion and inherent power to stay discovery until preliminary questions that may dispose of the case are determined." *Fujita v. United States*, 416 F. App'x 400, 402 (5th Cir. 2011). In the context of a motion to dismiss specifically, "a district court has discretion to stay discovery if the disposition of the motion might preclude the need for discovery altogether." *Primesource Building Products, Inc. v. Lee Group International, Inc.*, 2020 WL 6140462, at * 1 (N.D. Tex. Aug. 12, 2020) (Starr, J.) (citations omitted). When determining whether to grant a stay of discovery, the court considers "the breadth of discovery sought, the burden of responding to such discovery, and the strength of the dispositive motion filed by the party seeking a stay." *Id.*

In the present case, discovery should be stayed pending the outcome of the instant motion to dismiss. It is well established in ERISA breach of fiduciary duty cases that "the prospect of discovery…is ominous, potentially exposing the ERISA fiduciary to probing and costly inquiries and document requests about its methods and knowledge at the relevant times." *St. Vincent*, 712 F.3d at 719. Given that the arguments raised in the instant motion to dismiss are "not frivolous" and "merit serious consideration," a stay of discovery should be granted to avoid the substantial burden and cost of discovery in ERISA actions. *Primesource Building Products, Inc.*, 2020 WL 6140462, at *2; *St. Vincent*, 712 F.3d at 719.

In the alternative, if the Court declines to stay discovery in its entirety pending the resolution of the instant motion, Defendant respectfully requests that the Court bifurcate discovery, so the parties may proceed with targeted discovery addressing statute of limitations issues. As stated above, 29 U.S.C. § 1113(2) requires a plaintiff to initiate an ERISA action within "three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation." In the instant matter, Plaintiffs acknowledge that the funds at issue – the JPMorgan TDFs – were no longer offered after November 17, 2021, and all assets in the JPMorgan TDFs were transferred to BlackRock Life Path Index TDFs at or about that date. AC. ¶ 106, n.9, n.17. Given these undisputed facts, Defendant should be permitted the opportunity to discover whether Plaintiffs' claims are completely time-barred based on the 3-year statute of limitations for actual knowledge prior to having to engage in far more extensive and expensive full merits discovery.

In *Colonna v. LoanDepot.com LLC*, 2024 WL 5047875 (Dec. 9, 2024) (Starr, J.), this Court granted a similar discovery bifurcation request. In *Colonna*, the Court dismissed all but one of the plaintiffs' claims at the 12(b)(6) stage. The Court declined to dismiss one of the claims because, *inter alia,* there were questions about when the plaintiffs should have reasonably known about the

alleged harm. Defendant then moved to bifurcate discovery, so individual discovery on the remaining claim could proceed first before proceeding with class discovery. Proceeding with individual discovery on the remaining claim, the defendant argued, would reveal whether the claim was barred by the statute of limitations and thus could dispose of the action. In granting the defendant's motion to bifurcate discovery, the Court stated: "[s]imply put, spending three months to figure out whether these claims are barred by a statute of limitations is more efficient than running the risk of undergoing over a year of discovery only to find out that the claims were barred all along." *Id.* at \*2. As the Court in *Colonna* reasoned: "while putting individual discovery first might not resolve the case, if it does, then knowing that up front rather than letting a dark statute-of-limitations cloud loom over the case for over a year is preferable." *Id.*

As with the request made by the defendant in *Colonna*, bifurcation of discovery in the instant matter may result in the dismissal of the entire action. There is a very narrow issue which the parties will address through this bifurcated discovery: Did the Plaintiffs have actual knowledge of their alleged claims more than three years before the complaint was filed in this action? Such discovery may well resolve the entire matter without the need for protracted and costly class discovery that will take up significantly more time and resources for the parties and this Court. Moreover, there would be no prejudice to Plaintiffs from the requested bifurcation.

Accordingly, the Court should exercise its discretion to stay discovery pending the outcome of the Defendant's motion to dismiss for failure to state a claim upon which relief can be granted. In the alternative, in the event the Court declines to stay discovery in its entirety pending the resolution of the instant motion, Defendant respectfully requests that the Court bifurcate discovery, so the parties may proceed with targeted discovery addressing statute of limitations issues.

## CONCLUSION

As demonstrated above, Plaintiffs' Amended Complaint fails to meet the pleading standards established by *Twombly* and *Iqbal* and should, therefore, be dismissed for failure to state a claim upon which relief can be granted. Plaintiffs have failed to sufficiently allege an imprudence claim because they failed to adequately explain how their so-called Comparator Funds are meaningful benchmarks to the JPMorgan TDFs and failed to claim anything more than a blanket assertion that the Comparator Funds "performed better" or "cost less." Plaintiffs' disloyalty claim fares no better as Plaintiffs have not alleged that the Plan prohibits Defendant from using forfeited funds as part of Defendant's contributions to the Plan. Moreover, using forfeited funds for this purpose has been widely accepted and, as such, these claims are frequently dismissed at the motion to dismiss stage.

For all the foregoing reasons, Defendant respectfully requests that the Court grant Defendant's motion to dismiss Plaintiffs' Amended Complaint in its entirety, without leave to amend, and grant such further relief as it deems just, proper, and equitable. Defendant further respectfully requests the Court exercise its discretion to stay discovery pending the outcome of the instant motion or, in the alternative, bifurcate discovery to permit Defendant to fully develop its statute of limitations defenses prior to having to engage in full merits discovery.

Dated: August 25, 2025

McKool Smith PC

/s/ Robert Manley
Robert Manley, Esq.
Texas Bar No. 00787955
300 Crescent Ct #1500
Dallas, Texas 75201
rmanley@McKoolSmith.com
Telephone: (214) 978-4226

176036014.1

**FOX ROTHSCHILD LLP**

/s/ Brian S. Cousin
Brian S. Cousin, Esq. (*admitted pro hac vice*)
New York Bar No. 2259182
Jose M. Jara, Esq. (*admitted pro hac vice*)
New Jersey Bar No. 043482015
Casey Katz Pearlman, Esq. (*admitted pro hac vice*)
New York Bar No. 5838453
101 Park Avenue 17th Floor
New York, NY 10178
Telephone: (212) 878-7900
bcousin@foxrothschild.com
jjara@foxrothschild.com
cpearlman@foxrothschild.com
-and-
Erin Garza Kessinger
Texas Bar No. 24105990
Saint Ann Court
2501 N Harwood Street, Ste. 1800
Dallas, Texas 75201
Telephone: (972) 991-0889
ekessinger@foxrothschild.com

**ATTORNEYS FOR DEFENDANT
COCA-COLA SOUTHWEST BEVERAGES LLC**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing document was served on all counsel of record by ECF in accordance with the Federal Rules of Civil Procedure on August 25, 2025.


_/s/ Brian S. Cousin_

Brian S. Cousin, Esq.

176036014.1