**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **MONICA DEL BOSQUE, JENNA RODRIGUEZ, FABIOLA SOLIS-GARAY, and PHILIP WATTERSON, Individually and on behalf of all others similarly situated,** | § § § § § § § § | |
| **Plaintiffs,** | § § | **CIVIL ACTION NO. 3:25-cv-01270-X** |
| **v.** | § § | |
| **COCA-COLA SOUTHWEST BEVERAGES LLC,** | § § § § | |
| **Defendants.** | § | |

**DEFENDANT COCA-COLA SOUTHWEST BEVERAGES LLC'S
MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS
THE SECOND AMENDED COMPLAINT AND STAY DISCOVERY PENDING
DETERMINATION OF THE MOTION TO DISMISS**

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ........................................................................................ 1

PROCEDURAL HISTORY............................................................................................... 3

STATEMENT OF FACTS ALLEGED.............................................................................. 5

    I.      The Company's 401(k) Plan ................................................................... 5

    II.     Target Date Funds and the Plan's Investments...................................... 6

    III.    The Alleged Comparator TDFs .............................................................. 9

    IV.    Plaintiffs' Claims .................................................................................... 9

LEGAL ARGUMENT...................................................................................................... 10

    I.      Standard on a Motion to Dismiss Under FRCP 12(b)(6)...................... 10

    II.     Plaintiffs Have Not Plausibly Alleged a Breach of the Duty of Prudence ........... 12

           A.     The Comparator Funds do not Provide a "Meaningful Benchmark" for the JPMorgan TDFs ..................................................................... 12

           B.     Absent a Meaningful Benchmark, the JPMorgan TDFs' Alleged Underperformance is not Sufficient to Infer Imprudence........................ 16

                i.     Allegations of a Relative Underperformance are, Without More, Insufficient to Maintain an Imprudence Claim............................. 17

                ii.    Plaintiffs Have Failed to Allege Any Defect in Defendant's Selection Process to Support a Claim of Imprudence................... 19

    III.    Plaintiffs' Claims are Time-Barred in Whole or in Part....................................... 21

    IV.    The Court Should Stay Discovery Pending Decision of the Instant Motion or, in the Alternative, Bifurcate Discovery to Determine the Statute of Limitations Issue................................................................................... 23

CONCLUSION................................................................................................................. 25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re 2014 Radioshack ERISA Litig.*,
165 F. Supp. 3d 492 (N.D. Tex. 2016) (O'Connor, J.)..............................................22

*Aguilar v. Nat. Prod. Workers Union Severance Tr. Plan*,
2019 WL 9514732 (C.D. Ca. Nov. 1, 2019)..............................................................22

*Anderson v. Intel Corp. Inv. Policy Comm.*,
137 F.4th 1015 (9th Cir. 2025) ..................................................................................21

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)....................................................................................................10

*Babcock v. Hartmarx Corp.*,
182 F.3d 336 (5th Cir. 1999) ......................................................................................21

*Baumeister v. Exelon Corp.*,
2023 WL 6388064 (N.D. Ill. Sept. 29, 2023) ............................................................17

*Beldock v. Microsoft*,
2023 WL 1798171 (W.D.Wa. Feb. 7, 2023) ...............................................14, 16, 18

*Beldock v. Microsoft Corp.*,
2023 WL 3058016 (W.D. Wa. Apr. 24, 2023) ...........................................................18

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)......................................................................................10, 11, 18

*Bracalente v. Cisco Systems, Inc.*,
2023 WL 5184138 (N.D. Cal. Aug. 11, 2023) ...........................................................20

*Colonna v. LoanDepot.com LLC*,
2024 WL 5047875 (N.D. Tex.Dec. 9, 2024) ..................................................24, 25

*Davis v. Wash. Univ. in St. Louis*,
960 F.3d 478 (8th Cir. 2020) ...............................................................................14, 15

*Fujita v. United States*,
416 F. App'x 400 (5th Cir. 2011) ...............................................................................23

*Hall v. Cap. One Fin. Corp.*,
2023 WL 233304 (E.D. Va. Mar. 1, 2023)...........................................................16, 21

*Hughes v. Nw. Univ.*,
 595 U.S. 170 (2022)..................................................................................10, 12, 19

*JSW Steel (USA) Inc. v. Nucor Corp.*,
 586 F. Supp. 3d 585 (S. D. Tex. 2022) ...................................................................11

*Locascio v. Fluor Corp.*,
 2023 WL 320000 (N.D. Tex. Jan. 18, 2023) ..........................................................12

*Matney v. Barrick Gold*,
 80 F.4th 1136 (10th Cir. 2023) .........................................................................14, 15

*Meiners v. Wells Fargo & Company*,
 898 F.3d 820 (8th Cir. 2018) ...........................................................*7*, 12, 14, 15, 17

*Parker-Hannifin v. Johnson, et al.*,
 No.24-1030 ..............................................................................................................14

*Parmer v. Land O'Lakes*,
 518 F. Supp. 3d 1293 (D. Minn. 2021).....................................................................15

*Perkins v. United Surgical Partners Int'l, Inc.*,
 2024 WL 1574342 (5th Cir. April 11, 2024) ...........................................................10

*Primesource Building Prods., Inc. v. Lee Group Int'l, Inc.*,
 2020 WL 6140462 (N.D. Tex. Aug. 12, 2020) (Starr, J.).........................................23

*Quigley on behalf of ConocoPhillips Savings Plan v. ConocoPhillips Company*,
 756 F. Supp. 3d 479 (S.D. Tex. 2024) ....................................................................22

*Smith v. CommonSpirit*,
 37 F.4th 1160 (6th Cir. 2022) ....................................................................3, 10, 18

*Sonnier v. State Farm Mut. Auto Ins.*,
 509 F.3d 673 (5th Cir. 2007) ....................................................................................5

*Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v.
 Morgan Stanley Inv. Mgmt. Inc. ("St. Vincent")*,
 712 F.3d 705 (2d Cir. 2013)..............................................................11, 15, 20, 23

*Tullgreen v. Hamilton*,
 2023 WL 2307615 (E.D. Va. Mar. 1, 2023).............................................................19

*United States v. Corinthian Colls.*,
 655 F.3d 984 (9th Cir. 2011) ...................................................................................16

iii

*White v. Chevron*,
     2017 WL 2352137 (N.D. Cal. May 31, 2017), *aff'd.,* 752 Fed. Appx. 453 (9th
     Cir. 2018) ...................................................................................................................20

**Statutes**

29 U.S.C. § 1002(2)(A)......................................................................................................5

29 U.S.C. § 1104......................................................................................................10, 11

29 U.S.C. § 1113..............................................................................................21, 22, 24

Fed .R. Civ. P. 12(b)(6)....................................................................................................1, 10

Fed. R. Civ. P. 26(c) ......................................................................................................23

Defendant Coca-Cola Southwest Beverages LLC ("Defendant" or the "Company"), by and through its attorneys, respectfully submits this Memorandum of Law in support of its motion (1) to dismiss the second amended complaint filed by plaintiffs Monica Del Bosque, Jenna Rodriguez, Fabiola Solis-Garay, and Philip Watterson (the "Second Amended Complaint" or "SAC"), under Rule 12(b)(6) of the Federal Rules of Civil Procedure ("FRCP"), for failure to state a claim upon which relief can be granted, and (2) to stay discovery pending the resolution of the instant motion.

## PRELIMINARY STATEMENT

Plaintiffs' SAC should be dismissed as a matter of law because plaintiffs have again failed to state a claim upon which relief can be granted. Having now had three opportunities to set forth their allegations, the SAC remains deficient, containing only vague, conclusory, and argumentative assertions that Defendant has allegedly breached its fiduciary duties under the Employee Retirement Income Security Act of 1974 ("ERISA") concerning the Company-sponsored 401(k) plan. Consequently, Plaintiffs' claims are insufficient to withstand the instant motion and should be dismissed with prejudice.

Plaintiffs Monica Del Bosque ("Del Bosque"), Jenna Rodriguez ("Rodriguez"), Fabiola Solis-Garay ("Solis-Garay), and Philip Watterson ("Watterson") (collectively, "Plaintiffs"), individually and on behalf of similarly situated participants in the Coca-Cola Southwest Beverages 401(k) plan (the "Plan"), allege that the Defendant breached its fiduciary duty of prudence under ERISA. Specifically, Plaintiffs contend that Defendants improperly selected certain JPMorgan SmartRetirement target date funds ("JPMorgan TDFs") as part of the Plan's investment lineup instead of other mutual funds, referred to as "Comparator Funds," that allegedly performed better over certain periods of time. Throughout the SAC, Plaintiffs reference these "Comparator Funds," claiming that they would have been preferrable investment options for the Plan and that, therefore, Defendant imprudently selected the JPMorgan TDFs.

1

However, Plaintiffs fail to establish that these "Comparator Funds" serve as meaningful benchmarks for comparison with the JPMorgan TDFs. Notably, Plaintiffs allege that the Comparator Funds "are just a few out of possibly a hundred more funds in [the Morningstar Lifetime Moderate] category which would have been superior to the JPMorgan TDFs." SAC ¶ 105. Plaintiffs further allege that both the JPMorgan TDFs and the Comparator Funds are all part of the Morningstar Lifetime Moderate Category which consists of more than 200 peer funds. *Id.* ¶ 103. Taking these allegations together suggests that numerous funds within the same Morningstar Category (Lifetime Moderate) performed worse than the JPMorgan TDFs.

As detailed below, the mere existence of other funds that may have outperformed the JPMorgan TDFs does not establish Defendant's imprudence in the selection process. Under ERISA, fiduciaries are not required to have the prescience to select the highest-performing fund. The core of a fiduciary's duty is not the outcome itself, but the prudent process used to select and monitor investments. In this regard, Plaintiffs' SAC is also deficient because it fails to allege that any aspect of the process used by Defendant in selecting the JPMorgan TDFs was imprudent. Instead, Plaintiffs rely solely on their allegations of underperformance as compared to their cherry-picked so-called "Comparator Funds" to support an inference that the Defendant's selection process was imprudent.

The Comparator Funds are not meaningful benchmarks, however, because they have significantly different goals and objectives. For example, while the JPMorgan TDFs are "to" retirement funds (which adjust their allocations between stocks, bonds, and cash "to" the age of retirement), all the so-called "Comparator Funds" are "through" retirement funds (which continue to adjust their allocations between stocks, bonds, and cash beyond the age of retirement). Thus, in comparing "to" TDF funds with "through" TDF funds, Plaintiffs compare apples to oranges—

2

namely, the performance of fundamentally different types of retirement mutual funds with different objectives, risk profiles, and bond to equity ratios. Accordingly, the Court should dismiss the SAC for this reason alone.

Relatedly, Plaintiffs have not provided enough information in the SAC regarding the investments held by the so-called Comparator Funds to demonstrate that those funds are comparable to the JPMorgan TDFs. In addition, Plaintiffs unfairly compare funds from different share classes (retail vs. institutional) which implicates other differences. As explained further below, as a matter of law, a determination of imprudence cannot "come down to simply pointing to a fund with a better performance." *Smith v. CommonSpirit*, 37 F.4th 1160, 1167 (6th Cir. 2022). This is especially true where, as here, the funds identified by the Plaintiffs are clearly distinguishable from the JPMorgan TDFs at issue.[1] For these reasons, and the reasons detailed below, Defendant respectfully requests that Plaintiffs' SAC be dismissed with prejudice.

## PROCEDURAL HISTORY

Plaintiffs filed their original complaint on May 20, 2025, asserting the following three claims against Defendant: (1) breach of the fiduciary duty of prudence; (2) breach of the fiduciary duty of loyalty; and (3) breach of ERISA's anti-inurement provision. *See* Dkt. No. 1. On July 21, 2025, Defendant moved to dismiss the complaint for failure to state a claim. *See* Dkt. Nos. 19–20.

---

[1]Additionally, while Plaintiffs no longer assert an imprudence claim based on alleged excessive fees and costs of the JPMorgan TDFs, their SAC still contains certain allegations relating to costs associated with the JPMorgan TDFs. *See* SAC ¶¶ 5–6. These allegations should be disregarded by the Court. In fact, the Department of Labor has stated:

> Remember, too, that higher investment management fees do not necessarily mean better performance. Nor is cheaper necessarily better. Compare the net returns relative to the risks among available investment options. And, finally, don't consider fees in a vacuum. They are only one part of the bigger picture, including investment risks and returns and the extent and quality of services provided.

*See "A Look at 401(k) Plan Fees"*, at p. 9, https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/401k-plan-fees.pdf.

Instead of responding to Defendant's motion to dismiss, Plaintiffs amended their complaint. *See* Dkt. No. 21. In doing so, Plaintiffs withdrew their anti-inurement claim and, instead, asserted only their fiduciary-duty claims. On August 25, 2025, Defendant moved to dismiss Plaintiffs' amended complaint for failure to state a claim. *See* Dkt. Nos. 24–25.

On November 13, 2025, the Court granted Defendant's motion to dismiss the amended complaint, concluding that "the plaintiffs' prudence claim must be dismissed because their comparator funds are managed differently from the funds at issue. Likewise, plaintiffs' breach of loyalty claim fails because neither ERISA nor [defendant's] 401(k) plan entitles them to the benefit of forfeited funds from other employees' accounts." Dkt. No. 31.

With respect to the dismissal of Plaintiffs' claim for breach of the fiduciary duty of prudence, the Court explained:

> Where, as here, plaintiffs do not allege specific facts surrounding the selection and maintenance process, courts—such as this one—have required plaintiffs to "provide a sound basis for comparison—a meaningful benchmark."
> When determining a meaningful benchmark, courts distinguish between actively and passively managed accounts and investment strategies. Here, plaintiffs identify four comparator funds that are "through" funds with similar investment strategies as the JPMorgan TDF accounts. But the complaint also states that the JPMorgan TDF accounts are a blend of passive and active management while its comparators are all actively managed. Because the accounts are managed differently, the Court concludes that the alleged comparators are not meaningful benchmarks. So plaintiffs fail to sufficiently allege Coca-Cola breached its duty of prudence based on selecting and continuing to use the JPMorgan TDFs.

Dkt. No. 31 at 6 (citations omitted).  Following the Court's dismissal of their amended complaint, on December 11, 2025, Plaintiffs filed the SAC. *See* Dkt. No. 33. The SAC's only remaining claim is for breach of the fiduciary duty of prudence in selecting and retaining the JPMorgan TDFs. As set forth in the Statement of Facts Alleged section below, Plaintiffs have attempted to cure the

deficiencies in their pleading by identifying six "Comparator Funds" (including two fund suites not previously identified) and changing the allegations about those Comparator Funds. However, as explained herein, Plaintiffs have still failed to sufficiently allege facts which provide a meaningful benchmark for comparison to the JPMorgan TDFs.

## STATEMENT OF FACTS ALLEGED[2]

### I.    The Company's 401(k) Plan

Defendant makes, markets, and distributes beverages in Texas and parts of Oklahoma, New Mexico, and Arkansas. SAC ¶ 26. Defendant sponsors a 401(k) plan, effective April 1, 2017, which is a defined contribution plan, or individual account plan, retirement plan established pursuant to 29 U.S.C. § 1002(2)(A). *Id.* ¶¶ 2, 26, 36. 37. Defendant is a named Plan fiduciary. *Id.* ¶¶ 26–27. Eligible participants (those employees having over thirty days of service with the Company) can make tax-deferred contributions from their salaries to the Plan. *Id.* ¶¶ 2, 38. Plaintiffs participated in the Plan during the Class Period which is defined in the SAC as October 28, 2018 through November 17, 2021. *Id.* ¶¶ 24, 28. Plaintiffs Del Bosque and Watterson invested in the JPMorgan SmartRetirement 2040A fund in the Plan. *Id.* ¶¶ 20, 23. Plaintiff Rodriguez invested in the JPMorgan SmartRetirement 2055A fund in the Plan. *Id.* ¶ 21. Plaintiff Solis-Garay invested in the JPMorgan SmartRetirement 2060 fund in the Plan. *Id.* ¶ 22.

The Plan provides individual accounts to each participant, which consists of (1) the amount contributed to those accounts and (2) any income, expenses, gains and losses, and forfeitures which may be allocated to the participant's account. *Id.* ¶ 36. Participants may contribute up to 50% of

---

[2] At the motion to dismiss stage, the well-plead facts set forth in the SAC are taken to be true. *See, e.g.*, *Sonnier v. State Farm Mut. Auto Ins.*, 509 F.3d 673, 675 (5th Cir. 2007). Thus, for purposes of this motion, the "Statement of Facts Alleged" is based on facts alleged in the SAC, materials attached and/or incorporated by reference into the SAC, and all publicly available materials. Accordingly, Defendant does not concede that any of the allegations contained in the SAC are true or accurate.

their salary, subject to the maximum amount permitted under the law. *Id.* ¶ 39. Participants who are 50 years of age or older may be eligible to make "catch-up" contributions to the Plan. *Id.* ¶ 40. Plan participants may also contribute amounts representing distributions from other qualified defined benefit or defined contribution plans. *Id.* ¶ 41. Participants are 100% vested in their voluntary contributions. *Id.* ¶ 46.

The Company makes "safe harbor matching contribution[s] each payroll period equal to 100% of [participant's[] first 3% of [their] pre-tax salary deferral contributions, plus 50% of the next 6% of [their] salary deferral contributions up to a maximum of 9% of [their] salary." SAC ¶ 42. Participants become 100% vested in the safe harbor matching contributions and nonelective contributions after completing two years of service at the Company, or after they reach the age of 65, become permanently disabled, or die. *Id.* ¶ 47–48. The portion of a participant's account that has not yet vested at the time a participant leaves the Company is considered a "forfeiture." *Id.* ¶ 49. These forfeitures may be used to restore participant accounts, offset Plan expenses, or reduce nonelective contributions. *Id.* ¶ 50. As of December 2021, the Plan had 9,975 total participants and $540,900,443 in total assets. *Id.* ¶¶ 12–13, 54.

## II.    Target Date Funds and the Plan's Investments

During each year of the Class Period, Plan participants were offered several investment options. SAC ¶ 52. In 2018, the Plan offered twenty-two investment options, including fourteen mutual funds valued at $240,943,644. *Id.* By the end of that year, the Plan's total assets had grown to $411,345,008. *Id.* ¶ 53. This figure increased further to $540,900,443 by the end of 2021. *Id.* ¶ 54. Among the Plan's investment options during the Class Period were the JPMorgan TDFs. *Id.* ¶ 52. Notably, the JPMorgan TDFs were, until November 2021, the only target date investment options available within the Plan. *Id.* ¶ 100.

Target date funds ("TDFs"), in general, are designed to offer plan participants a single diversified investment option. *Id.* ¶ 74. The target date of the JPMorgan TDFs corresponds to the participant's expected retirement year. *Id.* These types of investments are attractive to plan participants who do not want to actively manage their retirement savings and may periodically rebalance to more conservative holdings as the retirement date approaches. *Id.* ¶ 79. This rebalance of the fund's portfolio occurs based on the fund's "glide path," which determines how a fund's asset allocations across underlying securities are expected to change over time and how they become more conservative as the retirement date approaches. *Id.* ¶ 80.

Multiple types of assets are included in a target date fund portfolio. *Id.* ¶ 78. This includes equity (stock) and fixed income (bond) securities. *Id.* Target date funds are divided into two broad categories: "to" funds or "through" funds. *Id.* ¶ 82. "To" target date funds are designed to allocate the underlying assets to the most conservative investments at the year of expected retirement. *Id.* By contrast, "through" target date funds continue their glidepath progression to reach their most conservative asset allocation past the expected retirement date. *Id.* The "through" method focuses on life expectancy of the participant rather than retirement date. *Id.*

Although Plaintiffs assert that the JPMorgan TDFs in the Plan were "through" funds (*id.* ¶ 83), this allegation is indisputably incorrect. The JPMorgan TDFs prospectuses expressly state that the JPMorgan SmartRetirement TDFs—the TDFs which were offered in the Plan at issue —are "to" target date funds.[3] In fact, the prospectus for each JPMorgan TDF at issue specifically states:

---

[3] Courts are permitted to consider fund prospectuses not attached to the complaint in connection with a motion to dismiss for failure to state a claim. *See, e.g.*, *Meiners v. Wells Fargo & Company*, 898 F.3d 820, 823 (8th Cir. 2018) ("We recognize the district court determined that the Vanguard fund's performance was not a meaningful benchmark by considering prospectuses not attached to the Complaint. This was not improper. The district court, like this Court, is allowed to look at matters outside the pleadings if those matters are necessarily embraced by the pleadings."). Attached to the Declaration of Brian S. Cousin, Esq., dated January 23, 2026, as Exhibits 1 through 5, are relevant excerpts from the JPMorgan SmartRetirement fund prospectuses filed with the United States Securities and Exchange Commission for years 2018, 2019, 2020, and 2021.

> The Fund is a 'to' target date fund. This means that the Fund intends to reach its most conservative strategic target allocations around the end of the year of the target retirement date. When the strategic target allocations of the Fund are substantially the same as those of the JPMorgan SmartRetirement Income Fund, the Fund may be merged at the discretion of the Fund's Board of Trustees.

*See* Declaration of Brian S. Cousin, dated January 23, 2026, Ex. 1, pp. 12, 28, 44, 60, 76, 92, 108, 124, 140; Ex. 2, pp. 12, 28, 44, 60, 76, 92, 108, 124, 140; Ex. 3, pp. 12, 20, 28, 45, 53, 61, 69, 78.; Ex. 4, pp. 10, 19, 28, 37, 46, 55, 64, 73, 82; *see also* Ex. 5, pp. 13, 23, 33, 43, 53, 63, 73, 83, 93, 103, 113 ("The Fund's asset allocation strategy is designed with two main goals in mind: promoting asset accumulation prior to retirement… and supporting investors withdrawing their investment in the Fund throughout retirement".).

Target date funds are also classified as "actively" or "passively" managed. SAC ¶ 84. If the fund is actively managed, the portfolio manager attempts to select stocks or bonds to generate investment returns that exceed the relevant benchmark index return. *Id.* If the fund is passively managed, the portfolio manager attempts to mimic the stocks and bonds portfolio of a relevant benchmark index.[4] *See* https://www.morningstar.com/columns/rekenthaler-report/active-vs-passive-framework-updated (last accessed January 21, 2026) (passive "indicates a fund that does not reflect an investment view, as its portfolio merely copies that of a market."). While actively managed funds require the portfolio manager to perform a significant amount of research and exercise discretion regarding which stocks and bonds to include in the portfolio, passive funds do not. *Id.* Because of this, passive funds generally charge a lower investment management fee and

---

[4] The SAC incorrectly states: "[w]ith a passively managed fund, the portfolio manager attempts to mimic the **performance** of a relevant benchmark index." ¶ 84 (emphasis added). Since this is clearly not an accurate description of a passively managed fund, it should not be accepted as true for purposes of this motion.

have a lower "expense ratio" relative to actively managed funds. *Id.* The JPMorgan TDFs are actively managed. *Id.* ¶ 97.

### III.    The Alleged Comparator TDFs

The SAC identifies six so-called Comparator Fund suites in an attempt to support Plaintiffs' position that the JPMorgan TDFs underperformed industry-accepted benchmarks for TDFs. SAC ¶ 94. The six alleged Comparator Funds and their respective fund families identified by Plaintiffs are: (1) American Funds target date suite, (2) MFS Lifetime target date suite, (3) MoA Clear Passage target date suite, (4) T. Rowe Price Retirement target date suite, (5) Fidelity Freedom K6 target date suite, and (6) Voya R6 Target Retirement Funds suite[5] (collectively, the "Comparator Funds"). *Id.* ¶¶ 94–95. These Comparator Funds were selected from categories created and identified by Morningstar. *Id.* ¶ 96. Plaintiffs further allege that Morningstar placed each of the funds in these suites in the target date category because they concentrate their holdings in the large blend/risk return category. *Id.* For that reason, Plaintiffs assert that these funds are accurate comparators. *Id.* Other than the Voya R6 Target Retirement Funds suite, as noted in footnote five, the Comparator Funds are also all actively managed. *Id.* ¶ 97.

### IV.    Plaintiffs' Claims

Plaintiffs assert that Defendant breached its fiduciary duty of prudence by failing to review the Plan's investment portfolio with due care to ensure the prudence of each investment in terms of cost and performance. SAC ¶ 14. Plaintiffs further claim that, as a result, Defendant mismanaged the Plan to the detriment of its participants and beneficiaries and, thus, breached its fiduciary duty of prudence, in violation of 29 U.S.C. § 1104. *Id.* ¶¶ 15–16. Plaintiffs also allege that the JPMorgan

---

[5] Plaintiffs improperly identify the Voya R6 Target Retirement Funds suite as actively managed. According to the link provided by Plaintiffs in the SAC, the Voya suite has blended management—both active and passive. *See* SAC ¶ 93(f) n. 18. Thus, for comparator purposes, Voya is plainly an insufficient comparator. *See Coca Cola Sw. Beverages*, 3:25-cv-01270-X, Dkt. No. 31, 2025 WL 3171326 (N.D. Tex. Nov. 13, 2025).

TDFs consistently underperformed the Comparator Funds identified. *Id.* ¶¶ 104, 107. Plaintiffs also assert that the JPMorgan TDFs underperformed funds identified in the Morningstar Lifetime Moderate category and the S&P target date index. *Id.* ¶¶ 111–112, 116–118.

## LEGAL ARGUMENT

### I.    Standard on a Motion to Dismiss Under FRCP 12(b)(6)

To survive a motion to dismiss under FRCP 12(b)(6), a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The plausibility standard requires "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). If a complaint contains facts that are "merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (*quoting Twombly*, 550 U.S. at 557). Further, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

When evaluating ERISA claims for breach of fiduciary duty under FRCP 12(b)(6), courts apply the pleading standards described in *Ashcroft* and *Twombly* by evaluating the allegations in the complaint "as a whole" and "giv[ing] due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise." *Hughes v. Nw. Univ.*, 595 U.S. 170, 177 (2022); *see, e.g.*, *Perkins v. United Surgical Partners Int'l, Inc.*, 2024 WL 1574342 (5th Cir. April 11, 2024) ("The well-settled pleading standards articulated in *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937 (2009) and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955 (2007), apply to duty of prudence claims brought under ERISA.").

ERISA "does not give the federal courts a broad license to second-guess the investment decisions of retirement plans." *Smith*, 37 F.4th at 1162. A fiduciary's decisions are evaluated "based upon information available to the fiduciary at the time of each investment decision and not

from the vantage point of hindsight." *Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc. ("St. Vincent")*, 712 F.3d 705, 716 (2d Cir. 2013). "When faced with two possible explanations for a defendant's conduct, only one of which results in liability, a plaintiff cannot offer allegations that are 'merely consistent with' their favored explanation but are also consistent with the alternative explanation." *JSW Steel (USA) Inc. v. Nucor Corp.*, 586 F. Supp. 3d 585, 595 (S. D. Tex. 2022) (quoting *Twombly*, 550 U.S. at 57). Further, ERISA § 404 provides, in relevant part, that a fiduciary must act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent [person] acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104.

Notably, one of the primary objectives of ERISA was to establish a framework that promotes predictability in legal liabilities and uniform standards of conduct across the many different circumstances involving employee benefit plans. However, Congress was mindful that overly burdensome compliance requirements could deter employers from offering benefit plans altogether.  As the U.S. Supreme Court in *Conkright v. Frommert* explained:

> Congress enacted ERISA to ensure that employees would receive the benefits they had earned, but Congress did not require employers to establish benefit plans in the first place. We have therefore recognized that ERISA represents a "'careful balancing' between ensuring fair and prompt enforcement of rights under a plan and the encouragement of the creation of such plans." Congress sought "to create a system that is [not] so complex that administrative costs, or litigation expenses, unduly discourage employers from offering [ERISA] plans in the first place." ERISA "induc[es] employers to offer benefits by assuring a predictable set of liabilities, under uniform standards of primary conduct and a uniform regime of ultimate remedial orders and awards when a violation has occurred."

559 U.S. 516, 517 (2010). This Court has acknowledged this "careful balancing," stating "'circumstances facing an ERISA fiduciary will implicate difficult tradeoffs, and courts must give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise.'" *Del Bosque*, 3:25-cv-01270-X, Dkt. No. 31, 2025 WL 3171326, at *3 (*citing Hughes*, 142 S.Ct. at 742).

## II.    Plaintiffs Have Not Plausibly Alleged a Breach of the Duty of Prudence

### A.    The Comparator Funds do not Provide a "Meaningful Benchmark" for the JPMorgan TDFs

To be a "meaningful benchmark," the Comparator Funds Plaintiffs identify must have more than "some similarities" to the JPMorgan TDFs. *Meiners*, 898 F.3d at 823; *Locascio v. Fluor Corp.*, 2023 WL 320000, *6 (N.D. Tex. Jan. 18, 2023) (Starr, J.) ("So what is a meaningful benchmark? The Fifth Circuit has yet to define it exactly, but clues that guide the definition exist in different courts. For example, courts have reasoned that distinguishing between actively and passively managed accounts is important to determine a meaningful benchmark. Additionally, benchmark funds with similar investment strategy can aid in an analysis of a meaningful benchmark."). As explained herein, Plaintiffs' allegations that the Defendant breached its fiduciary duty of prudence fail because the Comparator Funds identified by Plaintiffs do not provide a "meaningful benchmark" for evaluating the performance of the JPMorgan TDFs.

Plaintiffs assert that the funds are sufficient comparators since "Morningstar places the six Comparator Funds and the JPMorgan TDFs in the Lifetime Moderate Index category because the underlying holdings of each fund match the risk return profile of this category." *Id.* ¶ 96. The Comparator Funds, however, are not sufficient comparators. Plaintiffs identify certain characteristics that the JPMorgan TDFs and the Comparator Funds allegedly share. For example, according to the SAC, the JPMorgan TDFs and the Comparator Funds invest in both stocks and

12

bonds, invest in both foreign and U.S. securities, and "pursue the same investment strategies." *Id.* ¶¶ 93(a)–(f). However, these generalized and conclusory allegations are insufficient to demonstrate that the alleged Comparator Funds are meaningful benchmarks to the JPMorgan TDFs. Significantly, the Department of Labor has issued guidance for retirement plan fiduciaries on the material differences between a TDF that uses a glidepath "through" retirement versus a glidepath that is "to" retirement. The Department of Labor in its guidance has stated:

> As the target retirement date approaches (and often continuing after the target date), the fund's asset allocation shifts to include a higher proportion of more conservative investments, like bonds and cash instruments, which generally are less volatile and carry less investment risk than stocks. The shift in the asset allocation over time is called the TDF's "glide path." It is important to know whether a target date fund's glide path uses a "to retirement" or a "through retirement" approach. A "to" approach reduces the TDF's equity exposure over time to its most conservative point at the target date. A "through" approach reduces equity exposure through the target date so it does not reach its most conservative point until years later.

*See* https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/fact-sheets/target-date-retirement-funds-erisa-plan-fiduciaries-tips.pdf (last accessed on January 22, 2026).

Here, the fact that the JPMorgan TDFs are actually "to" funds—as stated in the prospectuses for the funds—and the Comparator Funds are "through" funds alone warrants a determination that the Comparator Funds do not provide a meaningful benchmark. As explained above, the difference between a "to" retirement fund and a "through" retirement fund is significant. This significant difference is acknowledged by Plaintiffs in the SAC: "[a] 'to' target date fund is designed to allocate its underlying assets to the most conservative investments at the year of expected retirement." SAC ¶ 82. "In contrast, a 'Through' target date fund continues its glidepath progression to reach its most conservative asset allocation past the expected retirement date. This

method focuses on the life expectancy of the participant rather than the retirement date." *Id.* One court has described the difference between "to" and "through" funds as follows: "'To retirement' strategies are 'managed to protect against the risk of a market decline significantly diminishing assets, while the 'through' approach focuses on the risk of outliving savings.' Thus, TDFs designed with a 'to' strategy 'typically de-risk faster than their 'through' peers.'" *Beldock v. Microsoft*, 2023 WL 1798171, at *2 (W.D.Wa. Feb. 7, 2023). When funds utilize different investment strategies—like "to" versus "through" retirement—they are not comparable and cannot be used as benchmarks against each other. *See Meiners*, 898 F.3d at 823 ("The fact that one fund with a different investment strategy ultimately performed better does not establish anything about whether the Wells Fargo TDFs were an imprudent choice at the outset."); *Beldock*, 2023 WL 1798171, at *2 (dismissing imprudence claim in part given "key differences" including that, "there are some key differences between the BlackRock TDFs and the Comparator TDFs. For example, the BlackRock TDFs are a 'to retirement' suite, while the Comparator TDFs are 'through retirement' suites".).

In the present case, Plaintiffs allege certain general similarities between the JPMorgan TDFs and the Comparator Funds with respect to their investment strategies, asset allocations, and fund management. *See* SAC ¶¶ 93–95. However, simply stating that two TDFs invest in stocks and bonds is insufficient to allege a meaningful benchmark.[6] *See, e.g., Matousek*, 51 F.4th at 281 (comparators "unlikely to be 'sound' or 'meaningful'" if they do not "hold similar securities, have similar investment strategies, [and] reflect a similar risk profile."); *Davis v. Wash. Univ. in St.*

---

[6] The U.S. Department of Labor ("DOL") and Solicitor General recently submitted an amicus brief on this same point to the Supreme Court in *Parker-Hannifin v. Johnson, et al.*, No.24-1030. In this amicus brief, the DOL states: "When allegations of relative underperformance are used to support an inference that a fiduciary imprudently retained an investment, the alleged underperformance must be established in relation to one or more meaningful benchmarks— *i.e.*, 'alternative investment options [that] have similar investment strategies, similar investment objectives, [and] similar risk profiles to the plan's funds.'" *See Brief for the United States as Amicus Curiae*, *Parker-Hannifin Corp., et al. v. Johnson, et al.*, Case No. 24-1030, p. 11 (citing *Matney v. Barrick Gold*, 80 F.4th 1136, 1148 (10th Cir. 2023).

14

*Louis*, 960 F.3d 478, 485–86 (8th Cir. 2020) (affirming dismissal of challenge to fund that invested in higher percentage of international stocks than purported comparators); *Matney v. Barrick Gold N.M.*, 80 F.4th 1136, 1154 (10th Cir. 2023) ("'each fund has distinct goals and distinct strategies' making a 'side-by-side comparison of how two funds performed ... with no consideration of their distinct objectives' unhelpful for determining which is the more prudent choice."); *Parmer v. Land O'Lakes*, 518 F. Supp. 3d 1293, 1306 (D. Minn. 2021) (dismissing complaint where each fund's prospectus confirmed that each fund held different concentrations of bonds).

Here, Plaintiffs have failed to plead any substantive claims about the specific types of investments within the Comparator Funds. Plaintiffs do not identify the percentage or type of equities, bonds, or other holdings within any of the Comparator Funds other than providing the chart in paragraph 94 of the SAC and attaching Appendix A, which states generally that each Comparator Fund invests in equities, bonds, and other holdings. This effort says nothing about the specific types of equity funds or bond funds that are included—which make significant differences to the funds. In *St. Vincent*, the Second Circuit held that plaintiffs could not lump together different types of mortgage bonds—a subset of bonds—because different types of mortgage bonds carry different risks and rewards. *See St. Vincent*, 712 F.3d at 722–23. In *Meiners*, the Eight Circuit held that different allocations to bonds rendered alleged comparator funds not meaningful benchmarks. *Meiners*, 898 F.3d at 823 n.2; *see Matousek*, 51 F.4th at 282 ("Just from their contrasting investment styles, the two have different aims, different risks, and different potential rewards that cater to different investors.") (citation omitted).

15

As Morningstar identifies, there are a variety of different types of bonds and equities. *See* SAC ¶ 90 n. 12.[7] For example, the type of U.S. equity funds within a target date fund may include: large blend, mid-cap blend, and/or small blend. *Id.* The type of international equity may include: foreign large growth and foreign small/mid-growth. *Id.* The type of bonds within a target date fund may include: intermediate government, short-term, and/or intermediate core. *Id.* In the present case, Plaintiffs' failure to allege any substantive information about the specific types of investments within either the JPMorgan TDFs or the Comparator Funds requires dismissal of the SAC. *See Hall v. Cap. One Fin. Corp.*, 2023 WL 233304, at *6 (E.D. Va. Mar. 1, 2023) (dismissing imprudence claim where "the Amended Complaint remains silent on whether the Comparator TDFs use 'through' or 'to' retirement glidepaths; whether the Comparator TDFs invest only in actively-managed or passively-managed funds; or how the Comparator TDFs' underlying equity and bond funds are allocated among the types and categories of possible equity and bond funds. In short, the Amended Complaint makes no factual allegations demonstrating that the Comparator TDFs are meaningful comparators to the BlackRock TDFs.").[8]

### B.     Absent a Meaningful Benchmark, the JPMorgan TDFs' Alleged Underperformance is not Sufficient to Infer Imprudence

Absent a "meaningful benchmark" for the JPMorgan TDFs at issue, Plaintiffs' allegations of underperformance are not sufficient to infer an imprudence claim. This is because underperformance alone is not sufficient to state a claim for imprudence.

---

[7] The Court may rely upon Morningstar's Category for Funds Definitions (https://advisor.morningstar.com/Enterprise/VTC/MorningstarCategoryClassificationforFunds_April2022.pdf) because Plaintiffs refer to and rely upon its contents in their SAC. *See Beldock*, 2023 WL 1798171 (W.D. Wa. Feb. 7, 2023); *United States v. Corinthian Colls.*, 655 F.3d 984, 999 (9th Cir. 2011).

[8] Plaintiffs also compare the Class A shares of the JPMorgan TDFs to Comparator Funds with Class R, I, and K shares which implicates additional differences. *See* SAC ¶¶ 94 (chart), 103 (chart), 106 (chart). This further demonstrates that Plaintiffs have not made the apples-to-apples comparison required for a meaningful benchmark.

### i.    Allegations of a Relative Underperformance are, Without More, Insufficient to Maintain an Imprudence Claim

As an initial matter, Plaintiffs concede that the performance histories of the JPMorgan TDFs "were *mediocre* when compared to their appropriate peer groups." SAC ¶ 86 (empasis added); ¶ 103 ("the JPMorgan series was mediocre at best from 2014."). Plaintiffs' use of the term "mediocre" is telling because while there are a variety of definitions of the term "mediocre," it is never defined as being the "worst." Rather, "mediocre" typically stands for average or middle-of-the-road. *See* https://www.dictionary.com/browse/mediocre (last visited January 20, 2026) (defining "mediocre" as "of only ordinary or moderate quality; neither good nor bad."). Thus, Plaintiffs are not even claiming that the performance of the JPMorgan TDFs was bad or poor. "Performance in the middle of the pack is not sufficient to suggest imprudence. ERISA does not enable Plaintiffs to sue simply because a fund is not the top performer – instead, the allegations must show that the fiduciary acted outside the permissible range of prudent decisions." *Baumeister v. Exelon Corp.*, 2023 WL 6388064, at *4 (N.D. Ill. Sept. 29, 2023).

Plaintiffs have not asserted that the Plan at issue offered the *worst* funds available, just that there were alternative options that may have been better. Thus, there can be no imprudence claim. Significantly, according to Plaintiffs, there are more than 200 peer funds in the Morningstar Lifetime Moderate group. That the Comparator Funds may have done better than the JPMorgan TDFS (as alleged by Plaintiffs), does not mean the JPMorgan TDFs were an imprudent choice— indeed, "[n]o authority requires a fiduciary to pick the best performing fund." *Meiners*, 898 F.3d at 823.

Plaintiffs seek to rely on the purported fund rankings in 2018 and 2020 in support of their imprudence argument. *See* SAC ¶ 114. Plaintiffs also assert that the JPMorgan TDFs "lagged behind the performance of the applicable Comparator Funds for many years before the inception

of the Class Period clearly showing that it was an imprudent choice for the Plan." *Id.* ¶ 108. Plaintiffs' reliance on these purported rankings, however, is misplaced as Plaintiffs appear intentionally to omit the fund rankings in 2019. The relative performance of the JPMorgan TDFs in 2019 would seem highly relevant to the Plaintiffs' allegation that the Defendant breached its fiduciary duty by including the JPMorgan TDFs in the Plan's fund lineup for that year and any subsequent year. By not including the fund rankings and performance for 2019, Plaintiffs' underperformance allegations are incomplete and defective. Additionally, as with the plaintiffs in *Beldock v. Microsoft Corp.*, Plaintiffs here simply provide charts of three- and five-year returns. The *Beldock* court held this as insufficient:

> Plaintiffs ask the court to infer, based on the quarterly charts of three- and five-year annualized returns… that Defendants must have breached their fiduciary duty…when they did not divest from the [Challenged] TDFs. They allege no facts, however, that would 'tend to exclude the possibility' that Defendants had reasons to retain the [Challenged] TDFs that were consistent with their fiduciary duties.

2023 WL 1798171, at *7 (W.D. Wa. Feb. 7, 2023). The court continued: "Where there are 'two possible explanations, only one of which can be true and only one of which results in liability,' Plaintiffs 'cannot offer allegations that are 'merely consistent with' their favored explanation but are also consistent with the alternative explanation.'" *Id.* Plaintiffs need to provide more information, "such as facts tending to exclude the possibility that the alternative explanation is true...in order to render plaintiffs' allegations plausible within the meaning of *Iqbal* and *Twombly*." *Id.* (internal citation and quotation omitted).

Plaintiffs have not done that here. Therefore, as with the imprudence claim in *Beldock*, the imprudence claim in the instant action should be dismissed. *See Smith*, 37 F.4th at 1166 ("Merely pointing to another investment that has performed better in a five-year snapshot of the lifespan of

18

a fund that is supposed to grow for fifty years does not suffice to plausibly plead an imprudent decision—largely a process-based inquiry—that breaches a fiduciary duty.").

> **ii.    Plaintiffs Have Failed to Allege Any Defect in Defendant's Selection Process to Support a Claim of Imprudence**

Even if Plaintiffs asserted that the JPMorgan TDFs were the worst performing fund – which they have not – if there was a prudent process in the selection of that fund, there would be no liability under ERISA. Here, Plaintiffs allege no facts about the process Defendant used for selecting and monitoring the JPMorgan TDFs. Instead, Plaintiffs ask the Court to infer that the process was flawed because the Comparator Funds allegedly performed better than the JPMorgan TDFs. However, such a broad assertion alone does not plausibly state a claim for imprudence. While underperformance can be a factor in assessing the prudence of an investment, such allegation in isolation cannot sustain a claim of imprudence. "ERISA simply does not provide a cause of action for fiduciary breaches based solely on a fund participant's disappointment in the fund performance." *Tullgreen v. Hamilton*, 2023 WL 2307615, at *6 (E.D. Va. Mar. 1, 2023).

Here, any alleged underperformance during a three- or five-year period, without more, does not suggest that offering the JPMorgan TDFs was outside the "'range of reasonable judgments'" that a fiduciary may make. *Id.* (*quoting Hughes*, 142 S. Ct. at 742) ("At times, the circumstances facing an ERISA fiduciary will implicate difficult tradeoffs, and courts must give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise."); *Beldock v. Microsoft Corp.*, 2023 WL 3058016, at *3 (W.D. Wa. Apr. 24, 2023) (dismissing plaintiffs' amended imprudence claim because "[a]s the court noted in its prior order, courts across the country have rejected claims for breach of the fiduciary duty of prudence under ERISA where the plaintiffs allege nothing more than underperformance relative to other investment vehicles.").

Plaintiffs have not offered facts to support any contention that Defendant employed imprudent methods to select or maintain the JPMorgan TDFs as part of the Plan lineup. Instead, Plaintiffs simply provide six alleged Comparator Fund suites and assert that they "performed better." As a matter of law, this is not enough to maintain a breach-of-fiduciary-duty claim under ERISA. It is possible a fiduciary "may reasonably select an investment alternative in view of its different risks and features, even if that investment option turns out to yield less than some other option." *White v. Chevron*, 2017 WL 2352137, at \*10 (N.D. Cal. May 31, 2017), *aff'd.,* 752 Fed. Appx. 453 (9th Cir. 2018); *see Bracalente v. Cisco Systems, Inc.*, 2023 WL 5184138, at \*4 (N.D. Cal. Aug. 11, 2023) ("Plaintiffs' 'underperformance-only' theory, however, would flatten this nuanced prudence evaluation into a one-dimensional comparison that considers only the funds' three- and five-year performance data. Despite asserting that a 'simple weighing of the merits and features of all other available TDFs' would reveal the BlackRock TDFs to be imprudent investments, the Complaint never discusses or revisits what other 'merits and features'—besides the funds' performance over a specific period—would support imprudence.").

Plaintiffs have failed to offer any facts about Defendant's selection of the JPMorgan TDFs, much less any facts showing that the process by which Defendant chose the JPMorgan TDFs was somehow flawed. Given Plaintiffs' failure to provide a meaningful benchmark, this is fatal to Plaintiffs' imprudence claim. *See White*, 2017 WL 2352137, at \*10 (dismissing imprudence claim where "plaintiffs [were] unable to allege any facts showing that the Plan fiduciaries failed to consider the advantages and disadvantages of various types of capital preservation funds before deciding to offer a money market fund to Chevron Plan participants."); *St. Vincent*, 712 F.3d at 716 (prudence analysis focuses on fiduciary's "conduct in arriving at an investment decision, not on its results, and ask[s] whether a fiduciary employed the appropriate methods to investigate and

determine the merits of a particular investment"); *Hall*, 2023 WL 2333304, at \*6 (dismissing underperformance claim where "Plaintiffs have provided no factual allegations from which the Court may reasonably infer that the choice of the BlackRock TDFs was imprudent from the moment the administrator selected it, that the BlackRock TDFs became imprudent over time, or that the BlackRock TDFs were otherwise clearly unsuitable for the goals of the fund based on ongoing performance. Plaintiffs allege nothing beyond data allegedly indicating the BlackRock TDFs' disappointing performance relative to Plaintiffs' preferred alternatives over the course of a limited period of time."). While generally plaintiffs may lack "extensive information regarding the fiduciary's 'methods and actual knowledge' because those details 'tend to be in the sole possession of [that fiduciary]]," an ERISA plaintiff receives extensive disclosures which can be used to show whether "a prudent fiduciary in like circumstances would have acted differently." *Anderson v. Intel Corp. Inv. Policy Comm.*, 137 F.4th 1015, 1025–26 (9th Cir. 2025) (internal citations omitted).

III.    **Plaintiffs' Claims are Time-Barred in Whole or in Part**

Under ERISA, fiduciary-duty suits must be filed within the following statute of limitations:

> No action may be commenced under this subchapter with respect to a fiduciary's breach of any responsibility, duty, or obligation under this part, or with respect to a violation of this part, after **the earlier** of— (1) six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission the latest date on which the fiduciary could have cured the breach or violation, or (2) three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation;

29 U.S.C. § 1113 - Limitation of actions (emphasis added). For purposes of the three-year statute of limitations, in the Fifth Circuit, "actual knowledge requires that the [Plaintiffs] know not only of the events constituting the breach, but 'also that those events supported a claim for breach of fiduciary duty or violation under ERISA.'" *Babcock v. Hartmarx Corp.*, 182 F.3d 336, 339 (5th

Cir. 1999); *In re 2014 Radioshack ERISA Litig.*, 165 F. Supp. 3d 492, 497–98 (N.D. Tex. 2016) (O'Connor, J.) ("A plaintiff has 'actual knowledge' of the breach or violation within the meaning of ERISA § 413(2), 29 U.S.C. § 1113(2), when they have knowledge of *all* material facts necessary to understand that an ERISA fiduciary has breached his or her duty or otherwise violated the Act").

Here, Plaintiffs define the "Class Period" as October 28, 2018, through November 17, 2021. SAC ¶ 28. The start of the Class Period, however, falls outside of the six-year statute of limitations under 29 U.S.C. § 1113(1) as six years prior to the initiation of this case would be May 20, 2019. There are several allegations in the SAC that refer to alleged imprudence and underperformance prior to May 20, 2019. *See, e.g.* SAC ¶¶ 103–105, 109–110, 111. Any such allegations are untimely and should be dismissed as any conduct that occurred prior to May 20, 2019, is outside the six-year statute of limitations. 29 U.S.C §1113(1); *see, e.g., Quigley on behalf of ConocoPhillips Savings Plan v. ConocoPhillips Company*, 756 F. Supp. 3d 479, 494 (S.D. Tex. 2024) (breach of fiduciary duty claims time barred because claim "premised on acts or omissions that occurred more than six years before they filed suit."); *Aguilar v. Nat. Prod. Workers Union Severance Tr. Plan*, 2019 WL 9514732, at *3 (C.D. Ca. Nov. 1, 2019) (dismissing claims as untimely to the extent they were based on conduct occurring outside of the six-year statute of limitations).

Additionally, the three-year actual knowledge statute of limitations also applies to Plaintiffs' claim. In the SAC, Plaintiffs state the JPMorgan TDFs were the only target date investment option offered under the Plan until November 17, 2021. SAC ¶¶ 52 n. 8, 100. Plaintiffs acknowledge that the JPMorgan TDFs were removed by the Defendant as an investment option on that date, when the assets in the JPMorgan TDFs were transferred to BlackRock LifePath Index series target date funds. Since Plaintiffs received notice of the elimination of the JPMorgan TDFs

22

from the Plan investment lineup and, thus, notice of those funds' final performance and costs as an investment option for the Plan, more than three years before Plaintiffs filed the Complaint, the three-year statute of limitations may entirely bar their claim related to those JPMorgan TDFs.

**IV.     The Court Should Stay Discovery Pending Decision of the Instant Motion or, in the Alternative, Bifurcate Discovery to Determine the Statute of Limitations Issue**

FRCP 26(c) permits a court to "make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Fed. R. Civ. P. 26(c). This includes the court's "broad discretion and inherent power to stay discovery until preliminary questions that may dispose of the case are determined." *Fujita v. United States*, 416 F. App'x 400, 402 (5th Cir. 2011). In the context of a motion to dismiss specifically, "a district court has discretion to stay discovery if the disposition of the motion might preclude the need for discovery altogether." *Primesource Building Prods., Inc. v. Lee Group Int'l, Inc.*, 2020 WL 6140462, at * 1 (N.D. Tex. Aug. 12, 2020) (Starr, J.) (citations omitted). When determining whether to grant a stay of discovery, the court considers "the breadth of discovery sought, the burden of responding to such discovery, and the strength of the dispositive motion filed by the party seeking a stay." *Id.*

Discovery should be stayed pending the Court's decision on Defendant's dismissal motion. It is well established in ERISA breach of fiduciary duty cases that "the prospect of discovery…is ominous, potentially exposing the ERISA fiduciary to probing and costly inquiries and document requests about its methods and knowledge at the relevant times." *St. Vincent*, 712 F.3d at 719. Given that Defendant's arguments are "not frivolous" and "merit serious consideration," a stay of discovery should be granted to avoid the substantial burden and cost of discovery in ERISA actions. *Primesource Building Prods., Inc.*, 2020 WL 6140462, at *2; *St. Vincent*, 712 F.3d at 719.

In the alternative, if the Court declines to stay discovery in its entirety, Defendant respectfully requests that the Court bifurcate discovery, so the parties may proceed with targeted discovery addressing statute of limitations issues. As stated above, 29 U.S.C. § 1113(2) requires a plaintiff to initiate an ERISA action within "three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation." Plaintiffs acknowledge that the JPMorgan TDFs were no longer offered after November 17, 2021, and all assets in the JPMorgan TDFs were transferred to BlackRock Life Path Index TDFs on or about that date. SAC ¶ 52 n.8; ¶ 100, n.20. Given these undisputed facts, Defendant should be permitted the opportunity to conduct discovery on whether Plaintiffs' claims are completely time-barred based on the three-year limitations period.

In *Colonna v. LoanDepot.com LLC*, 2024 WL 5047875 (Dec. 9, 2024) (Starr, J.), this Court granted a similar discovery bifurcation request. In *Colonna*, the Court dismissed all but one of the plaintiffs' claims at the motion-to-dismiss stage. The Court declined to dismiss one of the claims because, among other reasons, there were questions about when the plaintiffs should have reasonably known about the alleged harm. Defendant then moved to bifurcate discovery, so individual discovery on the remaining claim could proceed first before proceeding with class discovery. Proceeding with individual discovery on the remaining claim, the defendant argued, would reveal whether the claim was barred by the statute of limitations and thus could dispose of the action. In granting the defendant's motion to bifurcate discovery, the Court stated: "[s]imply put, spending three months to figure out whether these claims are barred by a statute of limitations is more efficient than running the risk of undergoing over a year of discovery only to find out that the claims were barred all along." *Id.*, at *2. The Court further reasoned: "while putting individual

24

discovery first might not resolve the case, if it does, then knowing that up front rather than letting a dark statute-of-limitations cloud loom over the case for over a year is preferable." *Id.*

Similar to the defendant's request in *Colonna*, bifurcation of discovery here may result in the dismissal of the entire action. There is a very narrow issue which the parties will address through this bifurcated discovery: Did Plaintiffs have actual knowledge of their alleged claims more than three years before the complaint was filed? This discovery may well resolve this case without the need for protracted and costly class discovery that will take up significantly more time and resources for the parties and the Court. Moreover, there would be no prejudice to Plaintiffs from the requested bifurcation. Accordingly, the Court should exercise its discretion to stay discovery pending its decision on Defendant's motion to dismiss. In the alternative, in the event the Court declines to stay discovery in its entirety pending the resolution of the motion, Defendant respectfully requests that the Court bifurcate discovery, so the parties may proceed with targeted discovery addressing statute of limitations issues.

## CONCLUSION

For all these reasons, Defendant respectfully requests that the Court grant Defendant's motion to dismiss the SAC in its entirety, with prejudice, and grant such further relief as it deems just, proper, and equitable. Defendant further respectfully requests the Court exercise its discretion to stay, or in the alternative bifurcate, discovery pending the Court's decision on the motion.

Dated:  January 23, 2026

        **MCKOOL SMITH PC**

        /s/ *Robert Manley*
        Robert Manley, Esq.
        Texas Bar No. 00787955
        300 Crescent Ct #1500
        Dallas, Texas 75201
        rmanley@McKoolSmith.com
        Telephone: (214) 978-4226

        **FOX ROTHSCHILD LLP**

        /s/ *Brian S. Cousin*
        Brian S. Cousin, Esq. (*admitted pro hac vice*)
        New York Bar No. 2259182
        Jose M. Jara, Esq. (*admitted pro hac vice)*
        New Jersey Bar No. 043482015
        Casey Katz Pearlman, Esq. (*admitted pro hac vice)*
        New York Bar No. 5838453
        101 Park Avenue 17th Floor
        New York, NY 10178
        Telephone: (212) 878-7900
        bcousin@foxrothschild.com
        jjara@foxrothschild.com
        cpearlman@foxrothschild.com
        -and-
        Erin Garza Kessinger
        Texas Bar No. 24105990
        Saint Ann Court
        2501 N Harwood Street, Ste. 1800
        Dallas, Texas 75201
        Telephone: (972) 991-0889
        ekessinger@foxrothschild.com

        **ATTORNEYS FOR DEFENDANT**
        **COCA-COLA SOUTHWEST BEVERAGES LLC**

26

## **CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was served on all counsel of record by ECF in accordance with the Federal Rules of Civil Procedure on January 23, 2026.

/s/ *Brian S. Cousin*
Brian S. Cousin, Esq.